**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Allied Nevada Gold Corp., *et al.*,[1] | ) | Case No. 15-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DECLARATION OF BARAK KLEIN IN**
**SUPPORT OF DEBTORS' MOTION FOR**
**ENTRY OF INTERIM AND FINAL ORDERS: (I)**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND**
**364 AUTHORIZING THE DEBTORS TO (A) OBTAIN**
**POSTPETITION FINANCING, (B) GRANT LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C)**
**USE CASH COLLATERAL OF PREPETITION SECURED PARTIES,**
**AND (D) GRANT ADEQUATE PROTECTION TO PREPETITION**
**SECURED PARTIES; (II) SCHEDULING A FINAL HEARING PURSUANT TO**
**BANKRUPTCY RULES 4001(b) AND 4001(c); AND (III) GRANTING RELATED RELIEF**

I, Barak Klein, declare the following is true and correct to the best of my knowledge:

1.      I am a Managing Director at Moelis & Company LLC ("***Moelis***"), the proposed financial advisor for Allied Nevada Gold Corp. ("***ANV***") and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  Moelis was engaged by the Debtors in January 2015 to serve as the Debtors' financial advisor in connection with a potential

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Allied Nevada Gold Corp. (7115); Allied Nevada Gold Holdings LLC (7115); Allied VGH Inc. (3601); Allied VNC Inc. (3291); ANG Central LLC (7115); ANG Cortez LLC (7115); ANG Eureka LLC (7115); ANG North LLC (7115); ANG Northeast LLC (7115); ANG Pony LLC (7115); Hasbrouck Production Company LLC (3601); Hycroft Resources & Development, Inc. (1989); Victory Exploration Inc. (8144); and Victory Gold Inc. (8139).  The corporate headquarters for each of the above Debtors are located at, and the mailing address for each of the above Debtors, except Hycroft Resources & Development, Inc., is 9790 Gateway Drive, Suite 200, Reno, NV 89521.  The mailing address for Hycroft Resources & Development, Inc. is P.O. Box 3030, Winnemucca, NV 89446.

restructuring of the Debtors.  Over the course of the last several months, Moelis has become familiar with the Debtors' business, finances, capital structure and operations.

**A.      Qualifications**

2.      I have more than 15 years of investment banking and asset management experience.  I have led complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities.  In particular, I have provided services to debtors and other constituencies in numerous restructurings, including, among others, *Revel AC Inc.*, *AMF Bowling Worldwide, Inc.*, *Catalyst Paper Corp.*, *Chemtura Corp.*, *General Growth Properties Inc.*, *ION Media Networks, Inc.*, *Lear Corp.*, *Sino-Forest Corporation* and *Yellow Media Ltd.*

3.      Prior to joining Moelis, I was a member of the CR Intrinsic-General Distressed Group of SAC Capital Advisors, where my primary responsibilities included investing in work-out and special situations.  I have also served as a senior vice president at Jefferies Asset Management and, prior to that role, I served as a vice president in the Restructuring & Recapitalization Group at Jefferies & Company.  I began my career in the Financial Restructuring Group at Houlihan, Lokey, Howard & Zukin.

4.      I submit this declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* (the "***DIP Motion***").[2]

---

[2]      Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the DIP Motion.

5.      I have been one of the principal engagement personnel working on Moelis's engagement with the Debtors since January 2015.  In connection with the proposed DIP Facility and use of Cash Collateral, I participated in discussions, due diligence and negotiations with potential financing sources.  In doing so, I worked with the Debtors' management and operational teams, outside counsel and other advisors.

**B.      Background on the Debtors' Financing Needs**

6.      As described in detail in the First Day Declaration, I believe a number of factors have contributed to the Debtors' liquidity needs, including, among other things, (a) the drop in gold and silver prices in recent years, (b) an overleveraged capital structure, the servicing of which requires significant capital resources, (c) the significant contractual capital requirements and delay of the Debtors' Hycroft Mill expansion project and (d) exposures under the cross currency swaps with Scotiabank, National Bank of Canada and Société Générale (Canada Branch).

7.      As a result of the foregoing, the Debtors' financial position significantly deteriorated since 2013, leaving the Debtors with less than $4.5 million in cash as of the Petition Date.  Indeed, in connection with its analysis of the Debtors' financing needs, Moelis assisted the Debtors in developing a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during that period.  Based on the Debtors' forecast, the Debtors will not have sufficient cash to, among other things, continue operating their business, maintain business relationships with their vendors and suppliers, pay employee wages in the ordinary course, make necessary capital expenditures and capital lease payments, or satisfy other working capital and operational needs during the upcoming 13-week period and beyond without access to financing.

**C.      The Debtors' Efforts to Obtain Postpetition Financing**

8.      In light of the Debtors' liquidity situation, prior to the Petition Date, the Debtors, with the assistance of Moelis and their other advisors, explored all practicable avenues to obtain financing from their existing lenders, bondholders and third-party financing sources. Specifically, in February 2015, the Debtors, with the assistance of their advisors, reached out to their existing lenders and bondholders regarding financing alternatives for the Debtors.  These discussions ultimately led to (i) weeks of extensive, good faith and arm's length negotiation of an overall restructuring pursuant to the RSA with both the Consenting Noteholders and the Prepetition Secured Parties and (ii) the documenting of the DIP Facility with the Consenting Noteholders on the terms described in the DIP Motion and set forth in the DIP Credit Agreement.

9.      Contemporaneously with these discussions, Moelis, on behalf of the Debtors, contacted 22 third-party financing sources, comprising a cross-section of traditional and non-traditional lenders capable of providing the requisite financing to the Debtors, to determine whether such parties had an interest in providing financing.  The Debtors provided NDAs to 18 parties and received signed NDAs from 12 of those parties.  Moelis also provided those parties that signed NDAs access to the Debtors' data room.  While none of the parties expressed interest in providing financing in connection with an out-of-court restructuring, some expressed interest in providing debtor in possession financing.  As of the date hereof, however, the Debtors have not received any term sheets from third-party financing sources regarding a third-party capital raise, nor has any such party expressed interest, contractually or verbally, in providing financing on similar or better terms than the financing provided by the DIP Lenders.

D.    **Benefits of the Proposed DIP Facility**

10.    I believe that, based upon the projections provided by the Debtors and considering the facts and circumstances of these chapter 11 cases, (i) the size of the proposed DIP Facility is both necessary and sufficient to meet the Debtors' immediate and projected liquidity needs through execution of the Restructuring Transaction, without which the Debtors and their stakeholders will likely suffer irreparable harm, (ii) there are no alternatives to the proposed DIP Facility at this time on terms more attractive to the Debtors and (iii) through arm's length negotiations with the Consenting Noteholders, the Debtors obtained the best available financing terms in these circumstances.

11.    It is my understanding that the proceeds of the proposed DIP Facility will be used to (i) make necessary capital expenditures and capital lease payments and satisfy other working capital and operational needs of the Debtors, (ii) pay employee wages in the ordinary course, (iii) pay administrative expenses attendant with the Debtors' chapter 11 cases, (iv) pay related transaction costs, fees and expenses, (v) pay critical vendors, Bankruptcy Code section 503(b)(9) claimants and certain trade claimants in accordance with first day orders approved by this Court, and (vi) make adequate protection payments to the Prepetition Secured Parties.  The Debtors have sought authority, in the DIP Motion, to immediately draw $35.0 million under the proposed DIP Facility.  Based on my discussions with the Debtors' management and my review of the weekly cash projections prepared by the Debtors, I believe this is an appropriate amount to allow the Debtors to stabilize their operations, establish prudent cash balances and meet their liquidity needs for the next four weeks.  Similarly, the $78.0 million total availability under the proposed DIP Facility appears to be sufficient to meet the Debtor's cash needs through the consummation of the Restructuring Transaction.  Absent prompt interim approval of the proposed DIP Facility,

the Debtors may have to curtail or even terminate their business operations, to the material detriment of all stakeholders.

12.    I also believe that there were no alternatives to the proposed DIP Facility that were more attractive to the Debtors.  The Consenting Noteholders are willing to provide the proposed DIP Facility as part of the Restructuring Transaction and to fund the Debtors' operations and the expenses attendant with these chapter 11 cases and post-emergence.  Indeed, although the Consenting Noteholders indicated they were unwilling to lend to the Debtors on an unsecured basis, I believe that (i) the Consenting Noteholders' ability and willingness to provide funding on tight timeframes on favorable terms and (ii) the reduced execution risk and increased certainty of closing offered by the Consenting Noteholders, support the Debtors' determination to enter into the proposed DIP Facility.

13.    Given the Debtors' need for immediate liquidity, time was of the essence.  While none of the other potential lenders that Moelis approached regarding alternate postpetition financing were willing to extend such financing to the Debtors on similar or better terms than those proposed by the DIP Lenders, it is likely that (i) any third lender party would require a "priming" security interest in and lien upon the Prepetition Secured Parties' collateral, which would have been opposed by the Prepetition Secured Parties and hence foreclosed the possibility of a swift and consensual restructuring, or (ii) to the extent any third-party lender would be willing to extend such financing on a second priority basis, such third-party would provide the Debtors with financing solely to fund the chapter 11 cases without also funding the Company and its operations post-emergence, which I believe is a significant benefit to the DIP Facility. Putting aside the risk that the Debtors might not ultimately prevail in a "priming" litigation with the Prepetition Secured Parties and therefore be left without any postpetition financing, the costs

and expenses—as well as potential damage to the Debtors' business—of a "priming" litigation would have been very difficult for the Debtors to endure. Similarly, obtaining second priority postpetition financing that solely funded the Debtors through a nonconsensual chapter 11 process would likely create additional costs and expenses for the Debtors' estates by requiring the Debtors to obtain exit financing and, potentially, litigate issues with their major constituents throughout these cases. Significantly, the Prepetition Secured Parties have consented to the Debtors' entry into the proposed DIP Facility. In summary, not only were none of the other potential lenders the Debtors approached willing to provide an alternate postpetition financing on similar or better terms than the proposed DIP Facility, but I also believe that the proposed DIP Facility provides the best means available to avoid a costly and damaging "priming" litigation and facilitates the consensual, value-maximizing, Restructuring Transaction, to the significant benefit of the Debtors and all of their stakeholders.

14.    I also believe that, through arm's length negotiations with the Consenting Noteholders, the Debtors obtained the best available financing terms. The Debtors and their advisors actively negotiated with the Consenting Noteholders and their advisors regarding the terms of the proposed DIP Facility, and as a result were able to improve several of the terms before eventually reaching the point where the Consenting Noteholders indicated they were unwilling to make any further concessions. Indeed, except for a minimal Cash Put Option Payment, which is payable in cash upon entry of the Interim Order, so long as the DIP Facility is satisfied at maturity pursuant to the Restructuring Transaction, the remaining fees to the DIP Lenders are payable, on the Effective Date in the form of New Second Lien Convertible Notes rather than in cash. This fee structure will enable the Debtors to conserve cash during the

chapter 11 cases and avoid the need to, in effect, round-trip a portion of the DIP Facility back to the DIP Lenders.

**E.**    **Conclusion**

15.    Based upon the foregoing and the facts and circumstances of these cases, I believe that the proposed DIP Facility is the best financing that is currently available to the Debtors, and the size of the proposed DIP Facility is both necessary and sufficient to meet the Debtors' immediate and projected liquidity needs through emergence.    I believe that immediate availability of $35.0 million of borrowings under the proposed DIP Facility upon the Interim Order, and additional $43.0 million after entry of the Final Order, is critical to the Debtors' continued operation and their ability to effectuate their financial and operational restructuring through consummation of the Restructuring Transaction.    Without immediate access to the proposed DIP Facility or another form of liquidity, I believe that the Debtors—and hence their stakeholders—will be irreparably harmed.

*[Remainder of this page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


Executed on March 10, 2015                    */s/ Barak Klein*_____
                                               Barak Klein
                                               Managing Director
                                               Moelis & Company