## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Allied Nevada Gold Corp., *et al.*,[1] | Case No. 15-_____ (   ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF STEPHEN M. JONES
## IN SUPPORT OF CHAPTER 11 PETITIONS AND
## VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

Stephen M. Jones, being duly sworn, deposes and states:

1.      I am the Executive Vice President, Secretary and Chief Financial Officer ("**CFO**") of Allied Nevada Gold Corp. ("**ANV**"),[2] and the CFO of all of the other above-captioned debtors and debtor in possession (collectively with ANV, the "**Debtors**").  Based on my positions with the Debtors, I am familiar with the Debtors' day-to-day operations, business and affairs.

2.      On the date hereof (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware. The Debtors are operating their business and managing their property as debtors in possession

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Allied Nevada Gold Corp. (7115); Allied Nevada Gold Holdings LLC (7115); Allied VGH Inc. (3601); Allied VNC Inc. (3291); ANG Central LLC (7115); ANG Cortez LLC (7115); ANG Eureka LLC (7115); ANG North LLC (7115); ANG Northeast LLC (7115); ANG Pony LLC (7115); Hasbrouck Production Company LLC (3601); Hycroft Resources & Development, Inc. (1989); Victory Exploration Inc. (8144); and Victory Gold Inc. (8139).  The corporate headquarters for each of the above Debtors is located at, and the mailing address for each of the above Debtors, except Hycroft Resources & Development, Inc., is 9790 Gateway Drive, Suite 200, Reno, NV 89521.  The mailing address for Hycroft Resources & Development, Inc. is P.O. Box 3030, Winnemucca, NV 89446.

[2]   ANV is a publicly-traded company and its stock has been trading on the New York Stock Exchange (the "**NYSE**") and the Toronto Stock Exchange (the "**TSX**") since May 2007 under the symbol "ANV".

pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed.

3.        In order to enable the Debtors to minimize any adverse effects that filing for chapter 11 relief may have on their business, the Debtors have requested various types of "first day" relief (collectively, the "***First Day Motions***").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought by each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtors' operations and balance sheet; (c) best serves the Debtors' estates and creditors' interests; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and irreparable harm.  The facts set forth in each First Day Motion are incorporated herein by reference.

4.        I submit this Declaration to provide an overview of the Debtors, their business and these chapter 11 cases, as well as in support of the Debtors' chapter 11 petitions and the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this Declaration are (a) based upon my personal knowledge of the Debtors' operations and finances, (b) learned from my review of relevant documents and information supplied to me by other members of the Debtors' management and the Debtors' advisors, or (c) my opinion based on my experience, knowledge and information concerning the Debtors' industry, operations and financial condition.  I am authorized by the Debtors' boards of directors or similar governing bodies to submit this

Declaration on behalf of each of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.        This Declaration is divided into six parts.  Section I of this Declaration provides an overview of the Debtors' background and business operations.  Section II of this Declaration describes the Debtors' prepetition capital structure and exposure under derivative instruments. Section III describes the Debtors' recent financial performance and events leading to the commencement of these chapter 11 cases.  Section IV describes the RSA (as defined below). Section V describes the key terms of the DIP Facility (as defined below) and the Debtors' efforts to obtain post-petition financing.  Section VI summarizes the relief requested in the First Day Motions.

## I.

## DESCRIPTION OF THE DEBTORS' BACKGROUND AND BUSINESS OPERATIONS

### A.    The Debtors' Background and Corporate Structure

6.        ANV, a Delaware corporation, is a publicly traded U.S.-based gold and silver producer engaged in mining, developing and exploring properties in the State of Nevada.  ANV was spun off from Vista Gold Corp. ("*Vista*") in 2006 and began operations in May 2007.  In connection with that certain Arrangement and Merger Agreement between ANV, Vista and Carl and Janet Pescio (the "*Pescios*"), ANV acquired Vista's Nevada-based mining properties and related assets, including the Hycroft Mine[3] and a portfolio of gold and silver exploration

---

[3]    Vista acquired the deed to the Hycroft Mine from Henry C. Crofoot and Daniel M. Crofoot (the "*Crofoots*"), who retained certain patented and unpatented mining claims that are leased to the Debtors in exchange for a 4% net profit royalty payment.  This mining lease also requires an annual advance payment of $120,000 every year mining occurs on the leased claims.  All advance annual payments are credited against the future payments due under the 4% net profit royalty.  The total payments due under the mining lease are capped at $7.6 million, of which the Debtors have paid approximately $2.1 million through December 31, 2014.  The Debtors currently estimate the remaining payments due under the mining lease will approximate $0.3 million in 2015, $2.1

properties located throughout Nevada.  In addition, ANV acquired the mineral property interests previously held by the Pescios, including royalty and/or other interests in a number of the properties.  Some of ANV's properties are located in historically prolific gold-producing trends[4] in Nevada.

7.      The Debtors primarily operate through ANV and its wholly-owned subsidiary Hycroft Resources & Development, Inc. ("*HRDI*").  ANV is the nerve center of the Debtors and is, among other things, responsible for all of the Debtors' general corporate functions.  HRDI owns and operates the Hycroft Mine, which is currently, and historically has been, the Debtors' sole operating mine.  The remaining Debtors hold interests in various exploration properties or are legacy entities with no material operations.

8.      The corporate structure chart, attached hereto as **Exhibit 1**, provides a general overview of the corporate structure for ANV and each of its subsidiaries, including both Debtor and non-Debtor entities.  As demonstrated on **Exhibit 1**, ANV, directly or indirectly, holds 100% of the equity interests in each of the following (i) Debtors:  Allied Nevada Gold Holdings LLC, Allied VGH Inc., Allied VNC Inc., ANG Central LLC, ANG Cortez LLC, ANG Eureka LLC, ANG North LLC, ANG Northeast LLC, ANG Pony LLC, HRDI, Victory Exploration Inc., Victory Gold Inc. and Hasbrouck Production Company LLC and (ii) non-Debtors:   Allied Nevada Delaware Holdings Inc. and Allied Nevada (Cayman) Corp.

---

million in 2016, and $3.1 million in 2017.  Patented mining claims are rights covering private land that is owned by the Crofoots.  Unpatented mining claims are rights covering public land on which the Crofoots own restricted rights to extract and develop certain mineral deposits, including gold and silver.

[4]      A trend is an expansive geographical ore (mineral-laden rock) body that contains mineralized material, such as gold and silver.

**B.**    **The Debtors' Mining Operations**

    (i)    *Hycroft Mine and Mill Expansion*

    9.    The Hycroft Mine is an open-pit heap leach operation[5] located 54 miles west of Winnemucca, Nevada.  As of December 31, 2014, there were estimated proven and probable mineral reserves at the Hycroft Mine of 10.6 million ounces of gold and 465.3 million ounces of silver, which are contained in oxide (heap leach) and sulfide (mill) ores.  Additionally, the Hycroft Mine remains open to the south with the potential for further expansion which could provide additional heap leach mineralized material.  In 2014, the Hycroft Mine produced approximately 216,900 ounces of gold and 1.8 million ounces of silver from its heap leach operations.

    10.    In September 2011, the Debtors announced and began a plan for a mill expansion project (the "***Hycroft Mill***"), which would allow the Debtors to process sulfide (mill) ores and extend the operating life of the Hycroft Mine.  However, due to declining metal prices and the resultant lower than expected cash flows generated by the Debtors' mining operations, in the second quarter of 2013, the Debtors deferred the construction of the Hycroft Mill and other expansion plans.

    (ii)    *Exploration Properties*

    11.    As of December 31, 2014, the Debtors controlled 75 exploration properties throughout Nevada, some of which are located on, or near, world class trends and current or past-producing mines.  Certain of these exploration properties have been optioned and leased to other exploration companies in return for production royalties averaging approximately 3.0% of

---

[5]    Open-pit mining is a process whereby ore is reached by digging or blasting from the ground level.  Heap leaching is a process by which gold or silver is extracted from ore by "heaping" the ore on impermeable leach pads and continually applying a weak cyanide solution that dissolves the gold and silver from the ore.  The gold- or silver-laden solution is then collected for gold or silver recovery.

revenue less certain allowable deductions.  Consistent with the Debtors' strategy and goal to preserve liquidity by managing discretionary spending, the Debtors have not commenced or planned any exploration activities at these properties since 2013 and do not currently employ an exploration workforce.

**II.**

**DEBTORS' PREPETITION CAPITAL STRUCTURE
AND EXPOSURE UNDER DERIVATIVE INSTRUMENTS**

**A.      Prepetition Funded Indebtedness**

12.      As of the Petition Date, the Debtors had total principal outstanding funded indebtedness of (a) approximately $75.0 million of borrowings and issued letters of credit under the Credit Agreement (as defined below), (b) approximately $58.3 million under the Term and Security Deposit Loan Agreement (as defined below), (c) $5,189,706 on account of the Jacobs Promissory Note (as defined below) and (d) CDN $400.0 million under the Senior Notes (as defined below).

*(i)      Credit Agreement*

13.      ANV is the borrower under that certain Third Amended and Restated Credit Agreement, dated as of May 8, 2014 (as may be amended, amended and restated, supplemented or otherwise modified, from time to time, the "***Credit Agreement***") among ANV, as borrower, The Bank of Nova Scotia ("***Scotia***"), as administrative agent, Scotia and Wells Fargo Bank, National Association ("***Wells Fargo***") as co-collateral agents, and the lenders party thereto.  The Credit Agreement matures on April 30, 2016.  The obligations under the Credit Agreement are collateralized by substantially all of the Debtors' assets and are guaranteed by all of the other Debtors.

14.    The maximum aggregate amount available to borrow and for issuance of letters of credit under the Credit Agreement is determined by a Borrowing Base (as defined in the Credit Agreement) that makes up to $75.0 million available to the Debtors depending upon 80% of the net realizable value of the gold and silver in the Debtors' ore on leach pads, in-process and finished goods inventories less estimated remaining processing and selling costs.  Borrowings under the Credit Agreement bear interest per annum at either LIBOR plus 4.5% or at an Alternate Base Rate Canada (as defined in the Credit Agreement) plus 3.5%.  As of the Petition Date, the total principal amount of borrowings outstanding under the Credit Agreement was $56.5 million, the total face amount of the letters of credit issued under the Credit Agreement was $18.5 million (corresponding to the letters of credit posted in connection with certain currency rate swaps discussed in Section B below) and approximately $0.5 million of accrued interest was outstanding.

(ii)    *Term and Security Deposit Loan Agreement*

15.    On March 27, 2013, HRDI entered into a term and security deposit loan agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Term and Security Deposit Loan Agreement**"), with Caterpillar Financial Services Corporation ("**Caterpillar**") as lender in connection with the purchase of three electric rope shovels.  Pursuant to the Term and Security Deposit Loan Agreement, up to $60.0 million ($20.0 million for each shovel) was made available to HRDI for scheduled advance security deposit payments pursuant to purchase agreements for the electric rope shovels, and up to $90.0 million ($30.0 million for each shovel) was made available to HRDI in term loan financing to fund the purchase of the electric rope shovels once commissioned at the Hycroft Mine.  Under the Term and Security Deposit Loan Agreement, as electric rope shovels were commissioned, amounts previously advanced to HRDI for security deposits, together with the remaining purchase price

of each electric rope shovel, were converted to term loan obligations.  Caterpillar has a first lien security interest on the electric rope shovels under the Term and Security Deposit Loan Agreement and HRDI's obligations thereunder are guaranteed by ANV.  As of the Petition Date, $40.3 million remained outstanding on the two executed term loan obligations, which are due by 2020 and bear interest at a fixed rate of approximately 5.7%, and $18.0 million, plus $1.6 million of accrued interest, remained outstanding as advances for security deposits under the Term and Security Deposit Loan Agreement, which bear interest at an applicable rate plus three-month LIBOR, which approximated 4.8% as of the Petition Date.

 (iii) *Jacobs Promissory Note*

16.     On October 15, 2014, HRDI issued a $7,189,706.00 promissory note (the "***Jacobs Promissory Note***") to Jacobs Field Services North America Inc. ("***Jacobs***") pursuant to a Release and Settlement Agreement between HRDI and Jacobs settling the action captioned *Jacobs Field Services North America, Inc. v. Hycroft Resources & Development, Inc.*, United States District Court for the District of Nevada Case No. 3:14-cv-00289.  The Jacobs Promissory Note is secured, through a deed of trust, by a security interest in certain of HRDI's real property, namely the Merrill Crowe Facility – Hycroft Mine, located in Humboldt County, Nevada, which security interest is second in priority and subordinate to the security interests securing the obligations under the Credit Agreement, and HRDI's obligations thereunder are guaranteed by ANV.  As of the Petition Date, the aggregate outstanding principal amount of the Jacobs Promissory Note is $5,189,706.

 (iv) *Senior Notes*

17.     ANV has issued CDN $400.0 million of senior unsecured notes (the "***Senior Notes***") pursuant to that certain indenture, dated as of May 25, 2012 (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "***Indenture***"),

by and between ANV and Computershare Trust Company of Canada, as indenture trustee.  The Senior Notes are denominated in Canadian dollars, pay interest semi-annually at a rate of 8.75% per annum and mature in June 2019.  The obligations under the Senior Notes are guaranteed by all of the Debtors except for Hasbrouck Production Company LLC.  As of the Petition Date, the aggregate outstanding principal amount of the Senior Notes is CDN $400.0 million.

**B.    Derivative Instruments**

18.    As of the Petition Date, the Debtors had (a) approximately $97.6 million of mark-to-market liability under the Cross Currency Swaps (as defined below) and (b) approximately $5.2 million of mark-to-market liability under the Diesel Swaps (as defined below).

*(i)    Cross Currency Swaps*

19.    In connection with the issuance of the Senior Notes, ANV entered into a cross currency swap with Scotia, a portion of which was subsequently novated to National Bank of Canada ("**NBC**") and Société Générale (Canada Branch) ("**SocGen**") (collectively, the "**Cross Currency Swaps**"), based upon a notional amount of US $400.4 million, which fixed the interest rate under the Senior Notes to an effective rate of 8.375%.  ANV is required to fully collateralize any mark-to-market liability position of the Cross Currency Swaps with NBC and SocGen in the form of either letters of credit or cash.  The obligations remaining under the Cross Currency Swap with Scotia and the Diesel Swaps are secured by a lien on the same assets that secure the Debtors' obligations under the Credit Agreement on a *pari passu* basis.  An approximate 1% depreciation in the Canadian/US Dollar exchange rate results in an approximate US $1.0 million increase in letters of credit or cash required to collateralize the mark-to-market liability position of the Cross Currency Swaps with NBC and SocGen.  As of the Petition Date, the Debtors had approximately US $75.1 million of mark-to-market liability under the Cross Currency Swap with Scotia and approximately US $22.5 million of mark-to-market liability under the Cross Currency

Swaps with NBC and SocGen, which the Debtors had posted US $18.5 million in letters of credit and US $3.6 million in cash to collateralize.

    *(ii)    Diesel Swaps*

20.    As of December 31, 2014, the Debtors had five outstanding diesel swaps (the "***Diesel Swaps***") with Scotia covering the year 2015 for 7.2 million gallons of diesel at an average price of approximately $2.62 per gallon, which represents approximately 60% of the Debtors' forecasted 2015 diesel consumption.  The Debtors had approximately a $5.2 million mark-to-market liability under the Diesel Swaps as of the Petition Date.

**C.    Capital Lease Obligations**

21.    The Debtors' capital lease obligations (the "***Capital Lease and Term Loan Obligations***"), which are for the purchase of mining equipment, bear interest at rates between 4% and 7% and primarily carry 60-84 month terms.  As of the Petition Date, the Debtors' owe $98.6 million in Capital Lease Obligations.

**D.    Trade Debt**

22.    As a gold and silver producer with significant operations in Nevada, the Debtors purchase mining equipment, processing commodities and other inputs from numerous vendors. As of March 6, 2015, the Debtors estimate that they owe approximately $33.1 million of trade debt.

**E.    Equity**

23.    As of the Petition Date, 126,193,336 shares of common stock of the Debtors are outstanding.[6]  As discussed above, the Debtors' common stock trades on the NYSE and the TSX. The Debtors' market capitalization was approximately $107.9 million as of the Petition Date.

---

[6]    The Debtors also have 10.0 million shares of authorized but not issued preferred stock.

24.     Additionally, as of the Petition Date, there are 10,875,000 warrants to purchase shares of ANV common stock issued and outstanding, exercisable until December 12, 2019, which is a date that is five years from the issue date.  As of the Petition Date, the warrants are exercisable for $1.10 per share.  The exercise price of the warrants is subject to customary adjustments, including for certain stock dividends and splits, equity sales, rights offerings, pro rata distributions, or similar events affecting ANV's common stock.  Additionally, the warrants contain a "half-ratchet" provision, which means that any new issuances of common stock (or securities convertible into common stock) at a price, exercise price, or conversion price below the then current exercise price of the warrants will result in the exercise price of the warrants being reduced to match the price of such new issuance.  If exercised, ANV must settle the warrants in its own stock with the exception of certain events or transactions, including reorganization, recapitalization, the sale or transfer of all of ANV's assets or properties, or the consolidation or merger of ANV with another entity.

### III.

### RECENT FINANCIAL PERFORMANCE AND EVENTS
### LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASES

A.     **The Debtors' Recent Performance**

25.     Over the past two years, despite a nearly doubling of gold and silver ounces sold, revenue has increased only modestly, mainly due to declining gold and silver prices.  Gold and silver sales represent 100% of the Debtors' revenues and, accordingly, the market prices of gold and silver significantly impact the Debtors' financial position, operating results, and cash flows. The market price of gold peaked at $1,895 per ounce in August 2011.  As of March 9, 2015, gold closed at $1,168.50 per ounce, down approximately 38% from the 2011 peak and down 16% from the last twelve-month high of $1,385 per ounce.  Similarly, the market price per silver

ounce has decreased over the last two years from $29.95 per ounce as of December 31, 2012 to $15.92 per ounce as of March 9, 2015.

**B.      Circumstances Surrounding the Commencement of the Chapter 11 Cases**

26.      Despite the Debtors' prepetition efforts to increase revenue, decrease costs, sell non-core assets, reduce or delay capital expenditures and raise capital to address the Debtors' liquidity constraints, the Debtors' liquidity has continued to deteriorate.  In an effort to meet their liquidity needs, during 2014 the Debtors increased their borrowing capacity under the Credit Agreement by $35.0 million, sold a mineral property for $20.0 million and completed a public offering of common stock and warrants for $21.8 million.  Despite these efforts, the Debtors' cash and cash equivalents decreased from $81.5 million at December 31, 2013 to $7.6 million at December 31, 2014.  The continuing loss of liquidity has been largely the result of (a) the drop in gold and silver prices in recent years, as discussed above, (b) an overleveraged capital structure, the servicing of which requires significant capital resources, (c) the significant contractual capital requirements and delay of the Hycroft Mill expansion project and (d) exposure under the Cross Currency Swaps.  Each of these factors is discussed in greater detail below.

*(i)      Decreased Gold and Silver Prices*

27.      As discussed above, the market prices for gold and silver have declined substantially from previous highs, which has had a direct negative impact on earnings and cash flows derived from operations.  The Debtors' average operating margin per gold ounce sold decreased approximately 66% to $295 in 2014 from $854 in 2012, thereby straining the Debtors' ability to fund their operations, service their debt and fund capital requirements.

*(ii)      Overleveraged Capital Structure*

28.      The Debtors' existing capital structure places a significant burden on free cash flow and contributed to the depletion of existing cash balances.  As discussed above, the Debtors

have, among other things, substantial (a) Capital Lease and Term Loan Obligations related to the purchase of expensive equipment for their planned use in the Hycroft Mill expansion project, which bear interest at rates between 4% and 7%, (b) semi-annual interest payment obligations under the Senior Notes and (c) a fully drawn $75.0 million Credit Agreement.

> *(iii)    Exposure Under the Cross Currency Swaps*

29.    As discussed above, the Debtors have significant exposure under the Cross Currency Swaps and are required to collateralize any mark-to-market liability position under the Cross Currency Swaps with NBC and SocGen with either letters of credit or cash.  Pursuant to the Cross Currency Swaps with NBC and SocGen, the Debtors have posted approximately $18.5 million in letters of credit, which were issued under the Credit Agreement, and approximately $3.6 million in cash, contributing to the Debtors' current liquidity position.

> *(iv)    Capital Requirements and Delay of the Hycroft Mill Expansion Project*

30.    From 2012 to 2014, the Debtors incurred approximately $668.9 million of capital expenditures for plant and equipment in connection with the expansion efforts of the Hycroft Mine, the majority of which related to the Hycroft Mill, including mills and mill-related components, a crushing system, and engineering and infrastructure costs.  During that same time period, the Debtors repaid an additional $113.2 million of financed capital expenditures for the Hycroft Mine's expanded mobile mine equipment fleet, which was to be utilized fully during the operation of the Hycroft Mill.  The Debtors' cash and cash equivalents, sources of liquidity and capital resources were depleted as the Debtors sought to satisfy the Hycroft Mine's capital requirements.

31.    During 2013 and 2014, the Debtors were unable to raise the remaining capital required to complete the construction of the Hycroft Mill, which, as of November 2014, was estimated at $1.39 billion.  The Debtors' inability to fund the construction of the Hycroft Mill

prevented the Debtors from increasing annual mine production to approximately 450,000 ounces of gold and 23.0 million ounces of silver per year – quantities which would increase revenues and total cash flows from operations using current metal prices.[7]  Although the Debtors invested significant capital in the expansion of the Hycroft Mine, in particular for the Hycroft Mill, they will not be able to realize any significant operational benefits until the Hycroft Mill is constructed, commissioned and operational.  However, due to the lack of liquidity and over-levered balance sheet, the Debtors are no longer able to raise the $1.39 billion necessary to commence and implement the Hycroft Mill expansion project.

## IV.

## RESTRUCTURING SUPPORT AGREEMENT

32.     Beginning in December 2014, the Debtors engaged legal and financial advisors to explore various restructuring alternatives.  The Debtors and their advisors commenced negotiations with certain of their lenders under the Credit Agreement as well as certain holders of the Senior Notes (the "***Consenting Noteholders***"), and their respective advisors, regarding terms of a potential restructuring that would de-lever the Debtors' balance sheet and enable the Debtors to implement a financial and operational restructuring.  After extensive, good faith and arm's length negotiations, the Debtors ultimately reached an agreement with the Consenting Noteholders, which was formalized by a restructuring support agreement (the "***RSA***").  The RSA is attached hereto as **Exhibit 2**.

33.     The RSA contemplates, among other things, that as long as the RSA remains in effect, the Debtors and the Consenting Noteholders have each agreed to support and take all reasonable actions necessary to implement the restructuring transaction (the "***Restructuring***

---

[7]     As stated above, as of March 9, 2015, gold closed at $1,168.50 per ounce and silver closed at $15.92 per ounce.

*Transaction*") contemplated in the RSA and the restructuring term sheet attached thereto (the

"*Restructuring Term Sheet*")[8] pursuant to a pre-arranged chapter 11 plan (the "*Plan*").  The key

terms of the Restructuring Transaction are as follows:[9]

- on the Effective Date, all allowed claims against each of the Debtors arising under the Credit Agreement, Cross Currency Swaps and Diesel Swaps shall be exchanged for New First Lien Term Loans in an aggregate principal amount equal to the amount of such ABL Claims, Existing Cross Currency Swap Claims and Existing Diesel Swap Claims, respectively;

- the DIP Facility Claims shall either be paid in full in cash upon occurrence of a Cash Payment Event, or, if a Cash Payment Event has not occurred prior to the Effective Date, all allowed DIP Facility Claims shall receive the following treatment:  (i) $25 million of the amount of DIP Facility Claims shall be exchanged for 25% of the New Common Stock, subject to dilution on account of (a) the Management Incentive Plan, (b) the New Warrants and (c) the New Second Lien Convertible Term Loans; and (ii) the amount of DIP Facility Claims in excess of $25 million (the "*Excess DIP Facility Claim Amount*") shall be exchanged for New Second Lien Convertible Term Loans in an aggregate principal amount equal to the Excess DIP Facility Claim Amount;

- on the Effective Date, all allowed claims against each of the Debtors arising under the equipment leases to which the Debtors are a party or otherwise bound shall receive the treatment as determined by the Company and the Requisite Consenting Noteholders;

- on the Effective Date, all allowed intercompany claims between the Debtors shall be adjusted, continued, or discharged to the extent determined by the Company and the Requisite Consenting Noteholders;

- on the Effective Date, all allowed claims arising under the Senior Notes and the Indenture (such allowed claims, "*Notes Claims*") shall be exchanged for 75% of the New Common Stock, subject to dilution on account of (a) the Management Incentive Plan, (b) the New Warrants and (c) the New Second Lien Convertible Term Loans; *provided*, *however*, that any holder of a Notes Claim on the applicable voting record date shall be entitled to elect to receive, in lieu of shares of New Common Stock, an amount of cash equal to $100 per $1,000 of Notes Claims; *provided*, *further*, that if the amount of cash distributable in respect of

---

[8]  Capitalized terms used in this paragraph but not otherwise defined shall have the meaning ascribed to such terms in the Restructuring Term Sheet.

[9]  The following summary is for informational purposes only.  To the extent of any inconsistency between this summary and the RSA, the RSA shall govern.

Notes Claims under the Plan exceeds the Notes Claim Cap, holders of Notes Claims that have elected to receive cash shall only receive their *pro rata* share of the Notes Claim Cap;

- holders of critical vendor claims or claims under Bankruptcy Code section 503(b)(9) against a Debtor (each as determined by the Company and the Requisite Consenting Noteholders) shall be paid in full in cash pursuant to an order of the Bankruptcy Court, subject to an aggregate cap of $18 million and provided that each holder of a critical vendor claim receiving payment on its claims provides trade terms to the Company acceptable to the Company and the Requisite Consenting Noteholders;

- holders of allowed general unsecured claims shall be paid in full in cash under the Plan;

- all allowed claims (a) arising from the rescission of a purchase or sale of shares, notes or any other securities of any of the Debtors or their affiliates, (b) for damages arising from the purchase or sale of shares, notes or any other securities of any of the Debtors or their affiliates, and (c) for violations of the securities laws that are subject to subordination pursuant to Bankruptcy Code section 510(b) (such allowed claims, "***Subordinated Securities Claims***"), shall be extinguished and not receive any property or consideration under the Plan; ***provided***, ***however***, that the Plan shall not extinguish any rights that a holder of Subordinated Securities Claims may have against existing insurance maintained by the Debtors; and

- if the class of holders of the Existing Common Stock votes in favor of the Plan, then on the Effective Date, holders of the Existing Common Stock shall receive, on a *pro rata* basis, the New Warrants.  Other than (a) holders of the Existing Common Stock (in their capacities as such) and (b) holders of intercompany equity, no holder of any equity, ownership or profits interest in any of the Debtors of any nature, or any options, warrants or other securities that are convertible into, or exercisable or exchangeable for, any equity, ownership or profits interests in any of the Debtors, shall receive a distribution under the Plan on account of such interests or securities.  On the Effective Date, all such interests and securities shall be extinguished without payment of any amounts or other distributions in consideration therefor.  If a holder of the Existing Common Stock votes in favor of the Plan and the class of the Existing Common Stock votes to accept the Plan, then such holder shall be deemed to have released any Subordinated Securities Claims that it owns or controls.  If the class of holders of the Existing Common Stock votes against the Plan, then holders of Existing Common Stock shall receive no recovery on account of their Existing Common Stock.

## V.

## KEY TERMS OF THE DIP FACILITY AND THE
## DEBTORS' EFFORTS TO OBTAIN POST-PETITION FINANCING

34.     Based on the 13-week cash flow developed by the Debtors, the Debtors will require additional liquidity in order to continue operating their business, maintain business relationships with their vendors and suppliers, pay employee wages in the ordinary course, make necessary capital expenditures and capital lease payments and satisfy other working capital and operational needs both pre- and post-emergence from chapter 11.    Accordingly, prior to the commencement of the chapter 11 cases, the Debtors, with the assistance of their financial advisors, negotiated the terms of a debtor in possession facility (the "*DIP Facility*") with the Consenting Noteholders (hereinafter, the "*DIP Lenders*").    The DIP Facility will provide sufficient financing for the Debtors to implement and consummate the Restructuring Transaction, meet their working capital needs, avoid short-term liquidity concerns and preserve the value of the Debtors' estates while in chapter 11.

35.     The availability under the DIP Facility should also provide comfort to the Debtors' vendors, employees and other stakeholders that the Debtors will have sufficient liquidity to continue to operate in the ordinary course.    The salient terms of the DIP Facility[10] are as follows:[11]

- the DIP Facility is a $78 million multiple-draw term loan facility, of which up to $35 million principal amount will be available to be drawn upon entry of the

---

[10]    Capitalized terms used in this paragraph but not otherwise defined shall have the meaning ascribed to such terms in the *Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief* (the "*DIP Motion*").

[11]    The following summary is for informational purposes only.    To the extent of any inconsistency between this summary and the DIP Motion, the DIP Motion shall govern.

Interim Order and an additional $43 million will be available to be drawn, in two additional loans, on and after May 1, 2015;

- the DIP Facility shall (x) be junior to the Prepetition Credit Agreement, the Cross Currency Swaps and the Diesel Swaps and (y) pay interest on a monthly basis at the rate of 12% per annum, 6% to be paid in cash and 6% to be paid in kind; *provided*, *however*, that if a Cash Payment Event shall occur, other than a Cash Payment Event triggered by the Debtors' failure to enter into the DIP Facility, then all interest under the DIP Facility (including all accrued and unpaid interest) shall be payable in full in cash;

- the proceeds of the DIP Loans will be used in a manner consistent with the DIP Credit Agreement and the Approved Budget;

- the Backstop DIP Lenders shall receive a Backstop Put Option Payment equal to 3.0% of the Total DIP Commitment on the Effective Date, which shall be payable in the form of New Second Lien Convertible Term Loans, provided that in the event of a Cash Payment Event, the full amount of each Backstop Put Option Payment shall be payable in full in cash;

- the DIP Lenders shall receive a 1% Cash Put Option Payment, payable in cash on the date on which the Interim Order is approved by the Bankruptcy Court; *provided*, *however*, that if the Debtors fail to enter into the DIP Credit Agreement and consummate the transactions contemplated thereby on or prior to the earlier of (x) ten (10) calendar days after the Petition Date and (y) two (2) business days after the date on which the Bankruptcy Court enters the Interim Order, the Cash Put Option Payment shall be payable in full in cash, (i) at the time of the closing of any financing transaction, from the proceeds of such financing transaction and (ii) otherwise, upon payment in full of all Swap Claims and ABL Claims (*provided* that, for the avoidance of doubt, no Creditor Party waives any termination right under the RSA as a result of such financing transaction); and

- the DIP Lenders shall receive a 4% PIK Put Option Payment, which shall be (x) due and owing on the Restructuring Support Effective Date and (y) paid on the Effective Date in the form of New Second Lien Convertible Term Loans in a principal amount equal to the PIK Put Option Payment; *provided*, *however*, that if a Cash Payment Event shall occur, then the full amount of the PIK Put Option Payment shall be payable in cash at the same time as the Backstop Commitment Payment is required to be paid to the Backstop DIP Lenders if a Cash Payment Event occurs; *provided*, *further*, that if a Cash Payment Event shall occur prior to the date on which any of the DIP Lenders (other than the Backstop DIP Lenders) makes loans under the DIP Facility, then the full amount of the PIK Put Option Payment shall only be payable to the Backstop DIP Lenders.

36.      The Debtors believe that the DIP Facility is the best financing available to the Debtors at this time.  Indeed, prior to entering into the DIP Facility with the Consenting Noteholders, the Debtors, with the assistance of their financial advisors, contacted 22 third-party financing sources capable of providing the requisite financing to the Debtors to determine whether such parties had an interest in providing financing.  The Debtors provided non-disclosure agreements ("*NDAs*") to 18 parties and received signed NDAs from 12 of those parties.  The Debtors also provided those parties that signed NDAs access to the Debtors' data room.  While none of the parties that were expressed interest in providing financing in connection with an out-of-court restructuring, some expressed interest in providing debtor in possession financing.  As of the date hereof, however, the Debtors have not received any term sheets from third-party financing sources regarding a third-party capital raise, nor has any such party expressed interest, contractually or verbally, in providing financing on similar or better terms than the financing provided by the DIP Lenders.  In addition, the Prepetition Secured Parties (as defined in the DIP Motion) have consented to the Debtors' entry into the proposed DIP Facility.

37.      Based upon the foregoing and the facts and circumstances of these cases, the Debtors submit that the proposed DIP Facility is the best financing that is currently available and that entry into the DIP Facility is in the best interests of the Debtors and all of their stakeholders.

## VI.

## DESCRIPTION OF RELIEF SOUGHT IN THE DEBTORS' FIRST DAY MOTIONS

38.      To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations and promote a soft landing in chapter 11, the Debtors have requested various forms of relief in their First Day Motions.  Summaries of

the First Day Motions, and the facts necessary to support the First Day Motions, are set forth on **Exhibit 3**. Generally, the First Day Motions seek authority to, among other things, obtain debtor in possession financing on an interim basis and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. Obtaining Court approval of the relief sought in the First Day Motions is essential to the Debtors' ability to work toward a successful restructuring that will benefit all of the Debtors' constituents, preserve customer relationships and maintain employee morale.

39.      Several of the First Day Motions request authority to satisfy certain prepetition obligations. I am advised by counsel that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty one days following the filing of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have tailored their requests for immediate authority to pay certain prepetition claims in those circumstances where failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

40.      I have reviewed each of the First Day Motions. The facts stated therein and in **Exhibit 3** are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in restructuring the Debtors' business successfully.

41.      For the reasons stated in **Exhibit 3** and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that

each of the First Day Motions be granted in their entirety, together with such other and further relief as this Court deems just, proper and equitable.

*[Remainder of page intentionally left blank]*

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Date: March 10, 2015

Name:   Stephen M. Jones
Title:    Executive Vice President, Secretary and Chief Financial Officer