## <u>EXHIBIT 3</u>

**FIRST DAY MOTION SUMMARIES**

# FIRST DAY MOTIONS[1]

## I.        Financing Motions

**A. Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief (the "*DIP Motion*")**

1.        The Debtors are in immediate need of postpetition financing to, among other things, continue the operation of business in an orderly manner, maintain business relationships with vendors and suppliers, pay employees and satisfy other working capital and operational needs—each of which is vital to preserving and maintaining the Debtors' going concern value. By the DIP Motion, the Debtors seek authority to (i) obtain $78 million of multi-draw postpetition financing in the form of the DIP Facility, (ii) grant liens and superpriority claims to the DIP Lenders, (iii) utilize cash collateral of Prepetition Secured Parties and (iv) grant adequate protection to the Prepetition Secured Parties.

2.        Prior to the Petition Date, the Debtors explored all practicable avenues to obtain financing from existing lenders, bondholders and third-party financing sources. Specifically, in February 2015, the Debtors, with the assistance of advisors, reached out to existing lenders and bondholders regarding financing alternatives for the Debtors. These discussions ultimately led to months of extensive, good faith and arm's length negotiation of an overall restructuring pursuant to the RSA with both the Consenting Noteholders and the Prepetition Secured Parties and the documenting of the DIP Facility with the Consenting Noteholders on the terms described in the DIP Motion and set forth in the DIP Credit Agreement.

---

[1]    Capitalized terms used but not otherwise defined in this Exhibit 3 shall have the meaning ascribed to them in the respective First Day Motions described herein.

3. The Debtors were unable to procure financing as part of a consensual chapter 11 process from any of these parties except the Consenting Noteholders. The Consenting Noteholders were not willing, and indeed no alternative lender was willing, to commit to postpetition financing solely on an unsecured or junior secured basis, and required priming liens pursuant to Bankruptcy Code section 364(d)(1), junior only to (i) the Carve-Out, (ii) the Prepetition Liens, (iii) a valid perfected lien that is a "Permitted Lien" (as defined in the DIP Credit Agreement) and expressly permitted in the DIP Credit Agreement to be senior to the DIP Liens granted to the DIP Agent and the DIP Lenders in the Interim Order to secure the DIP Obligations and (iv) the Prepetition Lender Replacement Liens. The Prepetition Secured Parties have consented to the proposed DIP Facility as well as to the use of cash collateral.

4. The "junior" DIP provided by the DIP Lenders eliminates the risk of a prolonged and costly "priming" litigation with the Prepetition Secured Parties. In addition, the terms of the DIP Facility, including the fees payable in connection therewith, are reasonable under the circumstances. Indeed, except for a minimal Cash Put Option Payment, which is payable in cash upon entry of the Interim Order, so long as the DIP Facility is satisfied at maturity pursuant to the Restructuring Transaction, the remaining fees to the DIP Lenders are payable on the Effective Date in the form of New Second Lien Convertible Notes rather than in cash. This fee structure will enable the Debtors to conserve cash during the chapter 11 cases and avoid the need to, in effect, round-trip a portion of the DIP financing back to the DIP Lenders.

5. I believe that without access to the DIP Facility, the Debtors will not have sufficient cash to, among other things, continue operations, maintain business relationships with vendors and suppliers, pay employee wages in the ordinary course, make necessary capital expenditures and satisfy other working capital and operational needs during the pendency of

these chapter 11 cases.  As a result, the Debtors may be forced to curtail or even terminate business operations to the material detriment of all stakeholders and parties in interest in these chapter 11 cases.  Accordingly, the Debtors determined that the DIP Facility from the Consenting Noteholders was the only option under the circumstances.  I believe that, in light of the Debtors' need for immediate liquidity, entry into the DIP Facility is in the best interests of the Debtors' estates and stakeholders.

   **B. Debtors' Motion for Authority to (A) Continue Using Their Existing Cash Management System, (B) Honor or Satisfy Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Bank Accounts and Business Forms and (D) Extend the Time to Comply with Bankruptcy Code Section 345(b) and Local Rule 4001-3 (the "*Cash Management Motion*")**

   6.      By the Cash Management Motion, the Debtors seek authority to continue using the Cash Management System, pay or satisfy certain related prepetition obligations, and maintain their existing Bank Accounts and Business Forms.  In the ordinary course of business, the Debtors utilize an integrated Cash Management System to (a) facilitate the efficient transfer of funds, which reduces the administrative burden and costs associated with manual transfers; (b) enable management to control, monitor and report on the Debtors' collection and disbursement of funds; and (c) ensure sufficient cash availability on a daily basis.  The Cash Management System is comprised of 12 Bank Accounts at four Banks.

   7.      In connection with their Cash Management System and overall operations, the Debtors maintain active collection and disbursement accounts at Wells Fargo Bank, National Association.  In addition to these collection and disbursement accounts, the Debtors maintain, pursuant to the terms of the Credit Agreement, a $10,000,000 investment account with Wells Fargo Securities, LLC, which $10,000,000 is subject to a first priority perfected lien in favor of the Administrative Agent under the Credit Agreement.  The Debtors have entered into deposit account control agreements with respect to all of their Bank Accounts, except for the Bank

Accounts at RBC Wealth Management, which accounts are held for the purpose of (i) holding vested employee restricted share units ("***RSUs***") for transfers to the employees upon the employees' direction for delivery of shares and (ii) holding the proceeds from the sale of employee RSUs, which subsequently are transferred to the employees.

8.      In the ordinary course of business, the Debtors transfer funds amongst themselves (collectively, the "***Intercompany Transactions***").  However, the Debtors do not transfer funds between themselves and their non-Debtor affiliates.  As a result, at any given time, Intercompany Transactions may exist that reflect intercompany receivables and payables (collectively, the "***Intercompany Claims***") made in the ordinary course between and among the Debtors.  The Debtors maintain a record of, and are able to ascertain, trace and account for, the Intercompany Claims as needed between and among the Debtors.  The Debtors will continue to maintain records of Intercompany Transactions in the postpetition period.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.  Accordingly, the Debtors are seeking authority to continue making the Intercompany Transactions and are requesting that the Court grant administrative priority status thereto.

9.      Additionally, in the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates, the Debtors believe it is appropriate to continue to use their Business Forms as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors in possession rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms.

10.     The burden of, among other things, closing prepetition Bank Accounts, opening new accounts, immediately printing new checks and revising the Cash Management System would create administrative burdens and cause unnecessary expense, utilization of resources and delay.  In addition, the interrelationships between the Debtors' operations and those of their affiliates, and the scope and breadth of their operations, mandate the use of the Cash Management System for a successful reorganization of the Debtors' business, as well as the preservation and enhancement of going concern value.  Maintaining the Cash Management System is crucial given the size and complexity of the Debtors' operations, and the interrelationships between and among the Debtors and any disruption to the Cash Management System would impede the Debtors' successful reorganization.

## II.        Operational Motions

**A. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, But Not Directing, Payment of Prepetition Wages, Salaries, and Other Compensation and Benefits and Continuation of Employee Benefits Programs and Related Administrative Obligations in the Ordinary Course, (B) Authorizing and Directing Applicable Banks and Financial Institutions to Honor and Process Related Checks and Transfers and (C) Scheduling a Final Hearing (the "*Wages Motion*")**

11.     By the Wages Motion, the Debtors seek interim authority to (a) make all payments related to Employee and Independent Contractor Wages and Employee Compensation, including related costs, (b) continue and make all required payments on account of the Employee Benefits, including health care and retirement programs and (c) continue and honor various past practices, programs, and policies as they relate to the Employees, including the reimbursement of certain Reimbursable Expenses.  The Debtors are also seeking authority, upon entry of the Final Order, to (i) honor, pay, satisfy or remit all claims and prepetition obligations related to the Director Fees, (ii) continue the SERP and honor their obligations thereunder in the ordinary course, (iii) offer Severance to certain non-insider Employees who are terminated involuntarily,

in an amount not to exceed $500,000 in the aggregate and (iv) continue their Employee Incentive

Programs as they relate to non-insiders in the ordinary course.

12.     The Debtors' average monthly compensation for Employees, including wages,

salaries, and other compensation totals approximately $2,269,174 (collectively, the "***Employee***

***Wages***"), and the Debtors estimate that the aggregate amount of accrued Employee and

Independent Contractor Wages (excluding Payroll Taxes and Deductions) earned prior to the

Petition Date that remain unpaid totals approximately $468,937 (the "***Unpaid Wages***").  None of

the Debtors' Employees or Independent Contractors are owed more than $12,475 for Unpaid

Wages as of the Petition Date.  The Debtors are also seeking authority to continue to collect and

remit the Deductions and Payroll Taxes associated with the Employee Wages.  As of the Petition

Date, the Debtors estimate that they owe approximately $185,649 in Payroll Taxes.  In addition,

the Debtors are seeking authority to reimburse their Employees for Reimbursable Expenses,

totaling approximately $33,175 and to otherwise continue to pay their Reimbursable Expenses in

the ordinary course of business.  Additionally, the Debtors are seeking authority to continue their

various Health Care Programs in the ordinary course of business and to continue to honor their

obligations and costs associated therewith.

13.     In addition, the Debtors are seeking authority to (i) maintain their 401(k) Plan and

supplemental executive retirement plan, (ii) continue to make the various matching contributions

in connection with such plans and (iii) pay the various administrative costs and fees associated

therewith.

14.     The Debtors have various other practices, programs and policies that provide

important benefits for their Employees, including, but not limited to, a number of incentive plans

designed to provide additional compensation and other benefits to Employees to encourage

exceptional Employee performance for the benefit of the Debtors' business (collectively, the "**Employee Incentive Programs**").  Specifically, the Debtors offer among other things, (i) a short-term cash-based bonus program for hourly Employees, which is based on certain performance metrics and paid on a quarterly basis, and (ii) an annual incentive plan for salaried Employees that consists of a cash portion and a stock portion and is based on certain operating metrics as determined by the board of Directors.  The cash portion of the annual incentive plan is paid at the end of every February and the stock portion consists of restricted stock units that are granted at the same time as the cash incentive payments but vest at a later date.  As of the Petition Date, the Debtors estimate that they do not owe any cash-based incentive payments under both the short-term and annual Employee Incentive Programs as of the Petition Date.  The Debtors seek authority to continue their Employee Incentive Programs as they relate to non-insiders and to honor their obligations thereunder in the ordinary course of business upon entry of the Final Order.

15.     To maintain the Debtors' operations and preserve the value of their estates, it is essential that the Debtors continue to operate, to the extent possible, in the ordinary course of their business.  To achieve that result, the Debtors must retain the uninterrupted service and loyalty of their lifeline, which are their Employees.  Payment of the Employee Compensation and continuation or satisfaction of the Employee Obligations and related arrangements is essential to this goal.  If the Debtors do not pay their obligations for compensation, benefits and reimbursable expenses, the Employees will face significant financial difficulties.  Employee morale and loyalty will be jeopardized at a time when Employee support is critical.  In the absence of honoring the Debtors' prepetition Employee obligations, Employees may seek alternative employment opportunities.  Accordingly, the relief requested in the Wages Motion is

critical to the Debtors' ability to operate effectively and to preserve the value of their estates throughout these chapter 11 cases and, therefore, is in the best interests of the Debtors, their estates and all of their stakeholders.

**B.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief (the "*Critical Vendor Motion*")**

16.     By the Critical Vendor Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition claims held by Critical Vendors (as defined below) in an amount not to exceed $10.9 million on an interim basis and $11.4 million on a final basis (with respect to both interim and final periods, the "*Critical Vendor Cap*"); and (b) granting related relief.

17.     As of the Petition Date, the Debtors believe they owe Critical Vendors approximately $11.4 million[2], which constitutes approximately 34 percent of the Debtors' accrued payables of approximately $33.1 million.  Because the Debtors typically pay for the products, supplies and services provided by the Critical Vendors within 20 to 30 days of receipt, the vast majority of prepetition amounts owed to Critical Vendors (approximately 96%) will become due and payable, in the ordinary course of business and, consistent with past practice, in the 21 days after the Petition Date.  The Debtors, however, believe they can manage their trade relationships through a final hearing on the motion if they are provided access to the Interim Critical Vendor Cap.

18.     The Debtors request authorization to pay the Critical Vendor Claims on the condition that that the Critical Vendors agree to continue supplying goods and services to the

---

[2] This figure does not include claims held by Critical Vendors that may be entitled to priority under Bankruptcy Code section 503(b)(9), which claims the Debtors have requested separate relief pursuant to the Trade Claims Motion (as defined below).

Debtors during the chapter 11 cases on terms at least as favorable to the Debtors as those practices and programs in place prior to the Petition Date.

19.    11.    The Debtors' ability to continue their operations following the commencement of these chapter 11 cases will largely depend upon the continued provision of goods and services by the Critical Vendors.  Accordingly, the Debtors believe that payment of the prepetition claims held by the Critical Vendors is necessary to operate the Debtors' business and maintain compliance with strict environmental, health and safety regulations.  Additionally, replacing such vendors, even when possible, could result in substantially higher costs for the Debtors and their estates.

**C.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims (A) of Shippers And Warehousemen, (B) of Miscellaneous Lien Claimants, (C) Arising under Bankruptcy Code Section 503(b)(9) and (D) Incurred in Connection with Postpetition Delivery of Goods and Services and (II) Granting Related Relief (the "*Trade Claims Motion*")**

20.    The Debtors rely on various third parties, such as the Shippers and Warehousemen and the Miscellaneous Lien Claimants, who provide goods and services to the Debtors and may be able to assert liens against the Debtors' assets.  In addition, due to the nature of the Debtors' business, certain vendors may have (a) claims under Bankruptcy Code section 503(b)(9) ("*503(b)(9) Claims*") or (b) claims entitled to administrative expense priority under Bankruptcy Code section 503(b)(1)(A) (collectively, the "*503(b)(1) Claims*" and, holders of such claims, the "*503(b)(1) Claimants*") for the Debtors' undisputed obligations arising from prepetition purchase orders outstanding as of the Petition Date for goods and services provided to the Debtors on or subsequent to the Petition Date.

21.    In order to prevent immediate and irreparable harm to the Debtors' business, the Debtors are seeking authority to pay the Shipping and Warehousing Claims in an amount not to exceed $638,000 (the "*Shipping and Warehousing Claims Cap*").  If the Shipping and

Warehousing Claims are not paid, the Shippers and Warehousemen may assert possessory liens for transportation or storage costs and refuse to deliver or store the Debtors' goods and supplies until their invoices are paid and their liens released, which will severely disrupt the Debtors' operations.

22.    The Debtors estimate that approximately $3.1 million on account of claims held by a number of third party contractors and vendors who can assert liens against the Debtors and their property have accrued as of the Petition Date.  As a result, the Debtors seek authority, in their reasonable business judgment, to pay and discharge the Miscellaneous Lien Claims, regardless of whether such Miscellaneous Lien Claimants have already perfected their interests, in an amount not to exceed $3.1 million.

23.    Certain vendors may be entitled to administrative expense priority under Bankruptcy Code section 503(b)(9) to the extent the Debtors received goods, supplies or materials  from a vendor, in the ordinary course of business, within the twenty-day period immediately preceding the Petition Date.  The Debtors seek authority to pay the 503(b)(9) Claims, in an amount not to exceed $9.2 million to preserve the going concern value of the Debtors' chapter 11 estates.  Additionally, the Debtors seek an order granting administrative expense priority under Bankruptcy Code section 503(b)(1) to all of the Debtors' undisputed obligations arising from the acceptance of goods and services subject to prepetition purchase orders that were outstanding as of the Petition Date.

**D.  Debtors' Motion for Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of Certain Equity Securities (the "*NOL Motion*")**

24.    The Debtors estimate that the amount of federal net operating losses ("***NOLs***") held by Allied Nevada Gold Corp. as of the date of the filing of the chapter 11 petition are approximately $177 million.  The NOLs are valuable tax attributes that may be used to offset the

Debtors' future taxable income. However, the Debtors' ability to use its NOLs could be substantially limited if there were an "ownership change" as defined under section 382 of the Internal Revenue Code. In general, an ownership change would occur if the percentage (by value) of the stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over the lowest percentage of stock by such shareholders at any time during the relevant testing period. To protect the Debtors' ability to maximize the use of their NOLs, the Debtors have proposed procedures for the continuous monitoring of the trading of Equity Securities so that the Debtors may seek substantive relief at the appropriate time if trading in equity securities may jeopardize the Debtors' ability to use its NOLs.

### E. Debtors' Motion for Interim and Final Orders (A) Determining Adequate Assurance of Payment for Future Utility Services, (B) Approving Adequate Assurance Procedures and (C) Granting Related Relief (the "*Utilities Motion*")

25.     In the ordinary course of business, the Debtors incur utility expenses for electricity and various telecommunications needs, provided by 4 Utility Providers. On average, the Debtors spend approximately $625,000.00 each month on utility costs. To provide adequate assurance of future performance to the Utility Providers, the Debtors propose to deposit into a special segregated account an aggregate amount of $317,000.00, which is an amount equal to the estimated aggregate cost for two weeks of utility service, calculated based on average monthly utility payments made during the previous year.

26.     Preserving utility services on an uninterrupted basis to the Debtors' offices, corporate headquarters and mines is essential to the Debtors' ongoing operations and to the success of their reorganization. Any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' operations, customer and business relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts. Accordingly,

the Debtors submit that it is critical that utility services continue uninterrupted during these chapter 11 cases.

### F.  Debtors' Motion (I) for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to Pay Certain Taxes and Fees and (II) Scheduling a Final Hearing (the "*Taxes and Fees Motion*")

27.    In the ordinary course of business, the Debtors incur sales, use, consumption, income, franchise, property, unemployment and other taxes (collectively, the "***Taxes***"), as well as certain other business licensing, reporting and regulatory fees (collectively, the "***Fees***" and, together with the Taxes, the "***Taxes and Fees***"), and pay or withhold and remit such Taxes and Fees to various taxing, licensing and other governmental authorities (collectively, the "***Authorities***") as required to continue operating in certain jurisdictions.  The Debtors pay or remit, as the case may be, the Taxes and Fees as incurred, on a monthly, quarterly, biannual, annual, or biennial basis, to the respective Authorities, in each case as required by applicable laws and regulations.[3]  As of the Petition Date, the Debtors estimate that they owe approximately $2,362,444 in unremitted Taxes and Fees.

28.    The Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways.  Among other things, the Debtors' failure to pay Taxes and Fees may lead to (a) assessment by the Authorities of immediate, irreversible penalties; (b) initiation by the Authorities of audit investigations, which would unnecessarily divert the Debtors' attention from the tasks required by the reorganization process at a critical time for the Debtors' business; and (c) attempts by the Authorities to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that would be administratively burdensome to the estates and potentially damaging to the ongoing

---

[3]    As described above, the Debtors are also required by law to withhold the Payroll Taxes, which, by the Wages Motion, the Debtors seek authority to continue withholding and paying.

12

viability of the Debtors' enterprise.  Accordingly, the relief requested in the Taxes and Fees

Motion is in the best interests of the Debtors' estates, their creditors and all other parties in

interest, and will enable the Debtors to continue to operate their business in chapter 11 without

disruption.

**G.  Debtors' Motion (I) for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to (A) Continue Debtors' Insurance Policies, (B) Maintain Debtors' Prepetition Premium Financing Agreements, (C) Pay Certain Obligations Related Thereto and (II) Scheduling a Final Hearing (the "*Insurance Motion*")**

29.     In the ordinary course of the Debtors' business, the Debtors maintain a number of

insurance policies that provide coverage for, among other things, workers' compensation,

ERISA, fiduciary liability, property, general liability, umbrella liability, excess liability, auto

liability, employment practices liability, surety bonds, officers liability and crime liability (each

an "***Insurance Policy***" and collectively, the "***Insurance Policies***"), in amounts and types of

coverage in compliance with state and local laws governing the multiple jurisdictions in which

they operate.  The Debtors pay their Insurance Policy premiums (collectively, the "***Insurance***

***Premiums***") based upon rates established and billed by each insurance carrier (collectively, the

"***Insurance Carriers***").  The total annual premiums under the current Insurance Policies are

approximately $4.10 million.

30.     In connection with the procurement of their Insurance Policies, the Debtors obtain

brokerage services from certain affiliates of Aon plc (collectively, the "***Brokers***").  The Brokers

assist the Debtors with the procurement and negotiation of the Insurance Policies, enabling the

Debtors to obtain policies on advantageous terms and at competitive rates, and sometimes

obtaining financing for Debtors' premium payments.  Additionally, the Debtors finance the

Insurance Premiums on certain of their Insurance Policies pursuant to agreements (the

"*Financing Agreements*") with First Insurance Funding Corp. ("*First Insurance*" or, the "*Finance Company*").

31.    Pursuant to the Financing Agreements, the Debtors made a cash down payment to First Insurance in the amount of $158,813.68 in respect of the Insurance Premiums for the First Insurance Policies and financed the remaining $1,721,968.32.  In connection with the financing, the Debtors agreed to pay eleven monthly installment payments, in the amount of $158,813.68 each, which reflects the remaining Insurance Premiums amount plus a total finance charge of $24,982.16, representing an annual interest rate of 2.89%.

32.    Disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including:  (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Policies; (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies; (c) losing good-standing certification to conduct business in states that require the Debtors to maintain certain levels of insurance coverage; (d) being unable to obtain similar types of insurance coverage; and (e) incurring higher costs for re-establishing lapsed policies or obtaining new insurance coverage.  Accordingly, the Debtors submit that the Insurance Policies are essential to the preservation of the Debtors' cash flow and estates, and the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and all of their stakeholders.

### III.    Procedural Motions

**A. Debtors Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "*Joint Administration Motion*")**

33.    The fourteen (14) Debtors in these chapter 11 cases include Allied Nevada Gold Corp. and thirteen (13) of its direct and indirect subsidiaries, each of which is wholly-owned or

controlled by Allied Nevada Gold Corp.  The Debtors have common ownership, and they share key financial and operational systems.

34.    The joint administration of these chapter 11 cases, will not give rise to any conflict of interest among the Debtors' estates.  Nor will joint administration adversely affect the Debtors' respective creditors because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the estates.  Thus, individual creditors' rights should not be harmed by the relief requested; by contrast, non-Debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

**B. Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor**

35.    The Debtors propose to retain Prime Clerk LLC ("***Prime Clerk***") as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices.  With such assistance, the Debtors will be prepared to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and will be capable of undertaking all necessary mailings.

36.    Consolidation of the Debtors' creditor lists into a single consolidated list of creditors and mailing notices to all applicable parties on such list will be sufficient to permit Prime Clerk to promptly notify those parties.  Approval of the Creditor Matrix Motion will allow the Debtors to (i) maintain a single consolidated list of creditors rather than preparing and filing separate matrices for each debtor, (ii) maximize efficiency and accuracy and (iii) reduce costs.

**C. Debtors' Application for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent (the "*Prime Clerk Retention Application*")**

37.    The Debtors have hundreds of potential creditors in these chapter 11 cases.  Accordingly, the Debtors propose to engage Prime Clerk to act as the Debtors' claims and

noticing agent to provide an effective and efficient manner of distributing notices to and processing claims of hundreds of the Debtors' creditors and parties in interest during the course of these chapter 11 cases.  Accordingly, the Debtors submit that the relief requested in the Prime Clerk Retention Application is necessary for the Debtors to effectively provide noticing services to the various parties in interest.