## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Allied Nevada Gold Corp., *et al.*,[1] | ) | Case No. 15-10503 (MFW) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Re: Docket Nos. 14, 15; 70, 74, 172, 178 & 209** |
|  | ) |  |

### FINAL ORDER: (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND (D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (II) GRANTING RELATED RELIEF

This matter is before the Bankruptcy Court on the motion dated March 10, 2015

(the "Motion")[2] of Allied Nevada Gold Corp., as a debtor and debtor in possession ("ANV" or

the "Borrower"), and its affiliated debtors and debtors in possession (together with the Borrower,

collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter

11 Cases"), for entry of an interim order (the "Interim Order") and a final order (this "Final

Order"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of title 11 of

the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 4001,

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Allied Nevada Gold Corp. (7115); Allied Nevada Gold Holdings LLC (7115); Allied VGH Inc. (3601); Allied VNC Inc. (3291); ANG Central LLC (7115); ANG Cortez LLC (7115); ANG Eureka LLC (7115); ANG North LLC (7115); ANG Northeast LLC (7115); ANG Pony LLC (7115); Hasbrouck Production Company LLC (3601); Hycroft Resources & Development, Inc. (1989); Victory Exploration Inc. (8144); and Victory Gold Inc. (8139). The corporate headquarters for each of the above Debtors are located at, and the mailing address for each of the above Debtors, except Hycroft Resources & Development, Inc., is 9790 Gateway Drive, Suite 200, Reno, NV 89521. The mailing address for Hycroft Resources & Development, Inc. is P.O. Box 3030, Winnemucca, NV 89446.

[2]    All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the applicable DIP Documents (as defined herein).

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(1) authorization for the Debtors to (A) obtain postpetition secured debtor in possession financing in an aggregate principal amount of up to $78,000,000 (the "DIP Facility") pursuant to the terms and conditions of this Final Order and that certain Secured Multiple Draw Debtor In Possession Credit Agreement (substantially in the form attached hereto as Exhibit A, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement"), dated as of March 11, 2015 (the "Closing Date"), by and among ANV, as borrower, the other Debtors as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, collectively, the "DIP Agent"), and the lenders named therein (the "DIP Lenders" and, together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Parties"), and (B) incur the "Secured Obligations" under the DIP Credit Agreement (such Secured Obligations, as provided for, and defined in, the DIP Credit Agreement, shall be referred to herein as the "DIP Obligations") (the DIP Credit Agreement, together with the Interim Order, this Final Order and any related agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents");

2

(2) authorization for the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and superpriority claims, including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (and, solely as set forth in Paragraph 10(c) of this Final Order, priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Agent, for the benefit of the DIP Parties, in the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in this Final Order; provided that all liens, security interests, superpriority claims and administrative claims in favor of the DIP Agent and DIP Parties will be second in priority to the liens, security interests, superpriority claims and administrative claims securing the Prepetition Secured Obligations;

(4) authorization for the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined herein) as provided herein, and the provision of adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined herein) of their interests in the Prepetition Collateral (as defined herein), including Cash Collateral, as set forth in Paragraph 11 below;

3

(5) authorizing the Debtors to borrow under the DIP Facility up to an aggregate principal or face amount of $78,000,000, to be incurred as follows: (i) an Initial Draw (as defined below) on the Closing Date in an aggregate amount equal to $35,000,000 and (ii) after May 1, 2015 and subject to the entry of this Final Order, two Additional Loans, in the aggregate principal amount of up to $43,000,000, in accordance with the DIP Documents to (A) fund expenses for working capital purposes of the Debtors and to otherwise fund the operations and administration of the Debtors during these Chapter 11 Cases, (B) make adequate protection payments and (C) pay costs and expenses in connection with the DIP Documents and these Chapter 11 Cases, including, but not limited to, professional expenses; and

(6) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order.

This Court having found that, under the circumstances, due and sufficient notice of the Motion and the final hearing held on April 15, 2015 (the "Final Hearing") was provided by the Debtors as set forth in Paragraph J below, and having held the Final Hearing on April 15, 2015 after considering all the pleadings, motions and other papers filed with this Court, as further stated on the record at the interim hearing held on March 11, 2015 to consider the interim relief requested in the Motion (the "Interim Hearing") and the pleadings, motions and other papers filed with this Court and as further stated on the record at Final Hearing; and this Court having entered on March 12, 2015 an order approving the Motion on an interim basis (the "Interim Order"); and this Court having overruled all unresolved objections to the final relief requested in the Motion; and upon the record made by the Debtors at the Final Hearing, the First

4

Day Declaration, and the *Declaration of Barak Klein in Support of Debtors' Motion for Entry of Interim and Final Orders: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Status, (C) Use Cash Collateral of Prepetition Secured Parties, and (D) Grant Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (III) Granting Related Relief*, and after due deliberation and consideration and good and sufficient cause appearing therefor:

### THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.     *Petition Date*.  On March 10, 2015 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     *Jurisdiction and Venue*.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors confirmed their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection with the Motion consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rules 2002-1(b), 4001-1, 4001-2 and 9013-1(m).

C. *Committee Formation*. On March 19, 2015, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official unsecured creditors' committee in these Chapter 11 Cases (the "Committee").

D. *Equity Committee Formation*. On April 10, 2015, the U.S. Trustee appointed an official committee of equity security holders in these Chapter 11 Cases (the "Equity Committee").

E. *Debtors' Stipulations*. Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in Paragraph 15 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)     Pursuant to that certain Third Amended and Restated Credit Agreement, dated as of May 8, 2014 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Credit Agreement" and, together with all loan and security documents related thereto, the "Prepetition Credit Documents"), among ANV, as borrower, the lenders party thereto (the "Prepetition Lenders"), The Bank of Nova Scotia ("Scotiabank"), in its capacity as Lead Arranger, Bookrunner and Administrative Agent (the "Administrative Agent"), Scotiabank and Wells Fargo Bank, National Association (the "Co-Collateral Agent"), in their capacities as Co-Collateral Agents (collectively, the "Prepetition Agents") , the Prepetition Lenders provided a revolving credit facility to or for the benefit of the Borrower (the "Prepetition Revolving Credit Facility"). As of the Petition Date, the Debtors were truly and justifiably indebted to the Prepetition Lenders and Prepetition Agents, without defense, counterclaim or offset of any kind, in respect of (A) loans made and letters of credit issued in the aggregate outstanding principal amount under the Prepetition Revolving Credit Facility of $74,950,000, plus accrued and unpaid interest and fees with respect thereto (which, as of the Petition Date, was $471,095.33, and (B) obligations under or relating to swap and hedging transactions between the Debtors and Scotiabank (in such capacity, the "Swap Counterparty" and, collectively with the Prepetition Secured Agents and the Prepetition Lenders, the "Prepetition Secured Parties"), pursuant to the ISDA Master Agreement between The Bank of Nova Scotia and Allied Nevada Gold Corp., dated as of May 15, 2012 (as amended, confirmed or modified form time to time), constituting Qualified Risk Management Agreements (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "Prepetition Secured Swaps"), which Prepetition Secured Swaps were terminated as of March 11, 2015, resulting in an obligation of the Debtors to Scotiabank in the amount of $86,306,704.28 (collectively, (A) and (B), together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Credit Documents

6

and the Prepetition Secured Swaps, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's obligations pursuant to the Prepetition Credit Documents, including all "Secured Obligations" under and as defined in the Prepetition Credit Agreement, collectively the "Prepetition Secured Obligations");

(ii)     To secure the Prepetition Secured Obligations, the Borrower granted to the Prepetition Secured Parties a first priority security interest in and lien (the "Prepetition Liens") upon all "Security" under and as defined in the Prepetition Credit Documents (collectively, the "Prepetition Collateral");

(iii)     (a) the Prepetition Secured Obligations constitute legal, valid, enforceable and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Credit Documents are valid and enforceable by the Prepetition Secured Parties against each of the Debtors; (e) the Prepetition Liens were perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise expressly permitted by the Prepetition Credit Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "Permitted Liens"); (f) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Secured Obligations exceeded the amount of the Prepetition Secured Obligations; (g) the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (h) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Secured Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery;

(iv)     Pursuant to that certain indenture, dated as of May 25, 2012 (as the same has been and may be amended, restated, supplemented or otherwise modified from

time to time in accordance with the terms thereof, the "Prepetition Notes Indenture" and, together with all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, the "Prepetition Notes Documents"), among ANV, as issuer, and Computershare Trust Company of Canada, as trustee (in such capacity, the "Prepetition Indenture Trustee"), ANV issued the 8.75% senior unsecured notes due 2019 (the "Prepetition Notes" and, the holders of such Prepetition Notes, the "Prepetition Noteholders" and, together with the Prepetition Indenture Trustee, the "Prepetition Notes Parties"). As of the Petition Date, approximately CAD \$400,000,000 in aggregate principal amount of Prepetition Notes, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Notes Documents, including but not limited to, accrued and unpaid interest, any fees, expenses and disbursements as provided under the Prepetition Notes Documents (collectively, the "Prepetition Notes Obligations") was outstanding;

(vi)     (a) the Prepetition Notes Obligations constitute legal, valid, enforceable non-avoidable and binding obligations of ANV, as issuer, and each of the guarantors party thereto; (b) no offsets, defenses or counterclaims to the Prepetition Notes Obligations exist; (c) no portion of the Prepetition Notes Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Notes Documents are valid and enforceable by the Prepetition Notes Parties against each of the Debtors; and (e) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Notes Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with the Prepetition Notes Indenture or the transactions contemplated thereunder or the Prepetition Notes Obligations, including without limitation, any right to assert any disgorgement or recovery;

(vii)    All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Agents and the other Prepetition Secured Parties, as applicable; and

(viii)    As a result of the commencement of the Chapter 11 Cases, the Debtors are in default of their debts and obligations under the Prepetition Credit Agreement and the Prepetition Notes Indenture.

F.    *Need for Post-Petition Financing.*    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the

8

DIP Facility and the use of Cash Collateral. The Debtors' ability to maintain business relationships with their vendors, suppliers, and employees, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability. In addition, based on the record presented at the Final Hearing: (i) the entry of this Final Order is necessary to avoid immediate and irreparable harm to the Debtors' estates; (ii) in the absence of the DIP Facility and the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; and (iii) the preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors.

G.    _No Credit on More Favorable Terms_.    Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtors without providing the DIP Agent for the benefit of the DIP Lenders the (i) DIP Superpriority Claims (as defined herein) and (ii) DIP Liens (as defined herein) in the DIP Collateral, as provided herein and in the DIP Documents.

H.    _Findings Regarding the DIP Facility_.    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors and

9

the DIP Parties and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Parties have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and the DIP Facility, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

      I.     *Need for Use of Cash Collateral*. A critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to continue to operate their businesses in the ordinary course, pay wages, maintain business relationships with vendors and suppliers, make payroll, make capital expenditures, make adequate protection payments, and generally conduct their business affairs so as to avoid irreparable harm to their estates and the value of their assets.

      J.     *Use of Proceeds of the DIP Facility; Use of Cash Collateral; Consent of Prepetition Secured Parties*. The Prepetition Secured Parties have consented to the (i) financing arrangements contemplated by this Final Order and the DIP Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Final Order. As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Parties and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents and in accordance with the Approved Budget (as defined herein), solely for the purposes set forth in the DIP Credit Agreement, including (v) working capital, capital expenditures and for other general corporate

10

purposes, (w) adequate protection payments, as provided for hereunder, (x) the permitted payment of costs of administration of the Chapter 11 Cases, (y) payment of fees and expenses related to the DIP Facility as set forth herein and in the DIP Documents, and (z) payment of such prepetition expenses as are contemplated by paragraph 11 hereof or as are otherwise consented to by the DIP Agent (at the direction of the Majority Lenders) and the Prepetition Agents and approved by the Bankruptcy Court. The consent of the Prepetition Secured Parties is expressly limited to the postpetition financing being provided by the DIP Lenders and the use of Cash Collateral (as contemplated by this Final Order and the DIP Documents) and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility or to any modified version of the use of Cash Collateral.

K.    *Adequate Protection*. The Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Final Order pursuant to sections 361, 363 and 364 of the Bankruptcy Code, as set forth in Paragraph 11 below, for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the Debtors' use, sale or lease of such collateral (including, for the avoidance of doubt, any transfer required by the Debtors of cash collateral held by Scotiabank to the extent such bank account is elected to be closed by the Debtors), (ii) market value decline of such collateral, (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iv) the subordination to the Carve-Out (as defined herein) (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

L.    *Notice*. Telephonic, facsimile notice or overnight mail notice of the Final Hearing and the proposed entry of this Final Order has been provided to: (i) the twenty-five (25) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee

11

for the District of Delaware (the "U.S. Trustee"); (iii) counsel to the proposed DIP Agent; (iv) counsel to the Prepetition Agents; (v) the Prepetition Indenture Trustee; (vi) all known parties asserting a lien against the DIP Collateral; (vii) proposed counsel to the Committee; (viii) proposed counsel to the Equity Committee; and (ix) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules and the Local Rules. Requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Final Order.

M.    *Necessity of Entry*.    Absent entry of this Final Order, the Debtors' businesses, properties and estates will be irreparably harmed. This Court concludes that entry of this Final Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based on the foregoing, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    Approval of Final Order. The Motion is approved on the terms and conditions set forth in this Final Order. Any objections to the final relief requested in the Motion that have not previously been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled. This Final Order shall become effective immediately upon its entry. All actions taken in connection with or in reliance on the Interim Order are hereby reaffirmed in full as if taken in connection with or in reliance on this Final Order.

12

2.      Approval of DIP Documents; Authority Thereunder.   The Debtors are hereby authorized, on a final basis, to be a party to and perform under the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be required or requested by the DIP Parties to implement the terms or effectuate the purposes of this Final Order and the DIP Documents.

3.      Validity of DIP Documents.   Each of the DIP Documents shall constitute, and is hereby deemed to be, the legal, valid and binding obligation of the Debtors party thereto, enforceable against each such Debtor in accordance with its terms.   No obligation, payment, transfer or grant of security under the DIP Documents or this Final Order with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.   Any DIP Documents entered into by any Debtor prior to the entry of this Final Order in accordance with the terms and conditions of the Interim Order are hereby approved and ratified in full.

4.      Authorization to Borrow; Use of Cash Collateral.   Until the Termination Date, the Debtors are hereby authorized, on a final basis, to borrow from the DIP Lenders under the DIP Facility in an aggregate principal amount up to $78,000,000, subject to the terms and conditions set forth in the DIP Documents, the Interim Order and this Final Order.   Subject to the terms and conditions of the Interim Order, this Final Order and the DIP Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the earlier of (a) the Maturity Date and (b) the date upon which the Debtors' right to use Cash Collateral is terminated hereunder.

13

5.    Use of Proceeds. From and after the entry of this Final Order, the Debtors shall use advances of credit under the DIP Facility only for the express purposes specifically set forth in this Final Order, the DIP Documents and in compliance with the Approved Budget, subject to the variances set forth in Section 11.2 of the DIP Credit Agreement and Paragraphs 6(c) and 6(d) hereof. The Debtors are authorized to use the proceeds of the loans advanced under the DIP Credit Agreement (the "DIP Loans"), in part, to make certain adequate protection payments to the Prepetition Secured Parties, as provided for in Paragraph 11 of this Final Order and the DIP Credit Agreement.

6.    Approved Budget.

(a)    General. Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Majority Lenders), the proceeds of the DIP Facility shall be used only in compliance with the Approved Budget. Attached as Exhibit B hereto and incorporated by reference herein is a summary 13-week cash flow forecast setting forth "Total Operating Disbursements," "Total Ounces of Gold Equivalent Sold" and "Total Ounces of Gold Sold" on a weekly basis for the period beginning as of the week of the Closing Date through the 13-week period following the Closing Date, broken down by week, including the anticipated weekly uses of the proceeds of the Loans, which shall include, among other things, available cash, cash flow, payment of trade payables and ordinary course expenses, total cash disbursements and capital expenditures, fees and expenses relating to the DIP Facility, and working capital and other general corporate needs of the Debtors (a more detailed version of such cash-flow forecast was delivered to the DIP Agent and DIP Lenders, the Prepetition Agents, and the U.S. Trustee in accordance with the terms of the Interim Order, hereinafter, the "Initial

14

Budget"). In addition, the Initial Budget includes the "Total Monthly Ounces of Gold Produced" during any monthly period commencing from the monthly period ending March 31, 2015.

(b)      Budget Covenants.  On the Thursday of every fourth week after the Closing Date (with the first delivery, for the avoidance of doubt, to be made on Thursday, April 9, 2015), the Debtors shall deliver to the DIP Agent (for further delivery to the DIP Lenders), the Prepetition Agents (for further delivery to the Prepetition Secured Parties), the advisors to the Committee (for further delivery to members of the Committee), and the advisors to the Equity Committee (for further delivery to members of the Equity Committee)[3] an update to the Initial Budget or the Approved Budget then in effect, as the case may be, in form and substance reasonably satisfactory to the DIP Agent (at the direction of the Majority Lenders), for the period commencing (and including) the week immediately following such date through (and including) the 13th week thereafter (each, an "Approved Budget").  To the extent reasonably satisfactory to the DIP Agent (at the direction of the Majority Lenders) in accordance with the immediately preceding sentence, each such update to the Initial Budget or Approved Budget then in effect, as the case may be, that is delivered in accordance with this Paragraph 6(b) and Section 11.1(ff)(i) of the DIP Credit Agreement shall be deemed the new Approved Budget then in effect.  Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect for all purposes hereof and the DIP Credit Agreement.  Any amendments made to the Initial Budget or Approved Budget shall be consistent with the terms of this Final Order.

(c)      Not later than 1:00 p.m. (New York time) on the Wednesday of each week after the Closing Date, the Debtors shall deliver to the DIP Agent (for further delivery to the DIP

---

[3]      Any provision of information under this Final Order to the advisors to the Equity Committee for further distribution to members of the Equity Committee shall be contingent on and subject to confidentiality arrangements reasonably acceptable to the Debtors and the Equity Committee.

Lenders), the Prepetition Agents (for further delivery to the Prepetition Secured Parties), the advisors to the Committee (for further delivery to the members of the Committee), and the advisors to the Equity Committee (for further delivery to the members of the Equity Committee) a report (and together with the report described in clause (d) below, a "Variance Report") comparing the actual (A) "Total Operating Disbursements" of the Obligors for the immediately preceding test period that is required to be tested under Section 11.2(q) of the DIP Credit Agreement, (B) "Total Ounces of Gold Sold" for the immediately preceding test period that is required to be tested under Section 11.2(q) of the DIP Credit Agreement, and (C) "Total Ounces of Gold Equivalent Sold" for the immediately preceding test period that is required to be tested under Section 11.2(q) of the DIP Credit Agreement, in each case, to the corresponding values set forth in the Approved Budget then in effect for such period.

(d)     Not later than 1:00 p.m. (New York time) on the 10th day of each month after the Closing Date, the Debtors shall deliver to the DIP Agent (for further delivery to the DIP Lenders), the Prepetition Agents (for further delivery to the Prepetition Secured Parties), the advisors to the Committee (for further delivery to the members of the Committee), and the advisors to the Equity Committee (for further delivery to the members of the Equity Committee) a Variance Report comparing the actual "Total Monthly Ounces of Gold Produced" of the Obligors for the immediately preceding month, to the corresponding values set forth in the Approved Budget then in effect for such period.

(e)     Until the Termination Date (as defined in the DIP Credit Agreement), and unless waived in writing in accordance with Section 14.14 of the DIP Credit Agreement, the Debtors agree to not permit at any time:

16

i.   (x) the aggregate amount of actual disbursements of the type set forth in the line item "Total Operating Disbursements" on the Approved Budget then in effect (the "Actual Operating Disbursements") for the week ending on March 20, 2015 to be more than 120% of the budgeted amount; (y) the aggregate amount of Actual Operating Disbursements for the week ending on March 27, 2015 to be more than 115% of the budgeted amount; or (z) the aggregate amount of the Actual Operating Disbursements for any subsequent weekly period (commencing from the week ending on April 3, 2015) to be more than 110% of the budgeted amount; provided, however, that, in any week that the amount of the Actual Operating Disbursements is less than the budgeted amount for such week, the amount by which the Actual Operating Disbursements is less may be carried forward and added to the budgeted amount for the immediately subsequent weekly period; provided, further, that, any such amounts carried forward shall not be taken into account in determining whether there is to be any amount carried forward beyond such immediately subsequent weekly period;

ii.   the aggregate ounces of the type set forth in the line item "Total Ounces of Gold Equivalent Sold" on the Approved Budget then in effect during any rolling four week period (commencing from the four week period ending on April 3, 2015) to be less than 90% of the budgeted amount;

iii.   the aggregate ounces of the type set forth in the line item "Total Ounces of Gold Sold" on the Approved Budget then in effect during any rolling four week period (commencing from the four week period ending on April 3, 2015) to be less than 90% of the budgeted amount; and

iv.   the aggregate ounces of the type set forth in the line item "Total Monthly Ounces of Gold Produced" on the Approved Budget then in effect during any monthly period (commencing from the monthly period ending March 31, 2015) to be less than 90% of the budgeted amount; provided, however, that, in any month that the amount of the actual ounces of gold produced is more than the budgeted amount for such week, the amount by which the actual ounces of gold produced is more may be carried forward and reduce the budgeted amount for the immediately subsequent month; provided further that any such amounts carried forward shall not be taken into account in determining whether there is to be any amount carried forward beyond such immediately subsequent month.

17

7.    Payment of DIP Fees and Expenses. The Cash Put Option Payment,
Backstop Put Option Payment and PIK Put Option Payment (each as defined and set forth in
Exhibit C hereto) are each hereby approved in their respective entirety and (a) the Debtors are
hereby authorized and directed to pay such fees in accordance with, and on the terms set forth in,
the RSA, (b) all provisions related to such fees in the RSA shall be expressly incorporated herein
by reference as if set forth herein in their entirety and (c) such fees shall only be payable if the
Prepetition Secured Obligations have been paid in full or otherwise in accordance with the RSA.
The Debtors are also hereby authorized and directed to pay upon demand all other fees, costs,
expenses and other amounts payable under the terms of the DIP Documents and all other
reasonable fees and out-of-pocket costs and expenses of the DIP Parties in accordance with the
terms of the DIP Documents (including, without limitation, the reasonable prepetition and
postpetition fees and out-of-pocket costs and expenses of one lead counsel (which shall initially
be Stroock & Stroock & Lavan LLP), one Delaware counsel (which shall initially be Young
Conaway Stargatt & Taylor, LLP), one Canadian counsel to the extent a Canadian insolvency
proceeding is commenced (which shall initially be Goodmans LLP), and any other necessary
local or regulatory counsel, and one financial advisor (which shall initially be Houlihan Lokey
Capital, Inc. ("Houlihan") in accordance with the terms of that certain letter dated February 23,
2015 (the "Engagement Letter") in connection with advising the DIP Parties), subject to
receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall
be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment
shall be required to file with respect thereto any interim or final fee application with this Court;
provided, however, that copies of any such invoices shall be provided contemporaneously to the
U.S. Trustee, counsel to the Committee and counsel to the Equity Committee; provided further,

18

however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information (the "Redactions"), and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. If the Debtors, U.S. Trustee, counsel to the Committee, or counsel to the Equity Committee object to the reasonableness of the fees and expenses of any DIP Parties, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Debtors, the U.S. Trustee, the Committee, or the Equity Committee, as the case may be, shall file with the Court and serve on such DIP Parties an objection limited to the reasonableness of such fees and expenses (each, a "Reasonableness Fee Objection"). Without limiting the foregoing, if the U.S. Trustee objects to the Redactions and such objection cannot be resolved within ten (10) days of receipt of such invoices, the DIP Parties subject to such Redaction objection shall file with the Court and serve on the Debtors and the United States Trustee a request for Court resolution of the disputes concerning the propriety of the disputed Redactions (each, a "Redaction Fee Objection," and each Reasonableness Fee Objection and Redaction Fee Objection may be referred to herein generally as a "Fee Objection"). Any hearing on an objection or request, as applicable, regarding payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the propriety of the Redactions and the reasonableness of the particular items or categories of the fees, costs, and expenses, in each case which are the subject of such objection or request, as applicable. The Debtors shall pay in accordance with the terms and conditions of this Final Order within fifteen (15) days after receipt of the applicable invoice (a) the full amount invoiced if no objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which an objection has been timely filed. All

19

such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents. As of the date of entry of the Interim Order, the Debtors' obligations under the Engagement Letter shall be deemed to be allowed administrative expense claims of the Debtors' estates pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, irrespective of whether (a) the Final Order is entered, (b) the DIP Loans are repaid, or are required to be repaid, prior to the scheduled maturity date under the DIP Facility (including by voluntary prepayment, mandatory prepayment, upon acceleration or otherwise), or (c) the Debtors enter into the DIP Credit Agreement and consummate the transactions contemplated thereby, whether or not a failure of any of these events to occur is a result of the Debtors entering into an alternative debtor in possession credit facility or another Alternative Transaction (as defined in the RSA). For the avoidance of doubt, the RSA and the Restructuring Term Sheet are not being approved by this Final Order except as to those provisions that are applicable to the DIP Facility (as such term is defined in the RSA) and expressly incorporated into this Final Order.

        8.    Indemnification. The Debtors are hereby authorized, on a final basis, to and hereby agree to indemnify and hold harmless the DIP Parties and each of their respective directors, officers, shareholders, employees, agents, representatives, attorneys, consultants, advisors and controlling persons, and each of their successors and permitted assigns (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP

Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by this Final Order (including, without limitation, the exercise by the DIP Parties of discretionary rights granted under the DIP Documents) or any action taken or omitted by the DIP Agent or the DIP Lenders under any of the DIP Documents or any document contemplated hereby or thereby; provided, that the Debtors shall not have any obligation to indemnify and hold harmless any Indemnified Party under this Paragraph with respect to any matter solely resulting from the gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages. All indemnities of the Indemnified Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents.

9. **DIP Superpriority Claims.** In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute senior administrative expense claims against each Debtor (the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c),

21

507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion

of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not

such expenses or claims may become secured by a judgment lien or other non-consensual lien,

levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to and

subordinate to the payment in full in cash of any amounts due in respect of the Prepetition

Lender Superpriority Claims and the Prepetition Secured Obligations, and under the Carve-Out;

provided, further that the DIP Superpriority Claims shall have recourse to and be payable from

all pre-petition and post-petition property of the Debtors and their estates and all proceeds

thereof (except as set forth below); provided, further, however, that the DIP Superpriority Claims

shall not have recourse to or be payable or satisfied from the proceeds of avoidance actions under

chapter 5 of the Bankruptcy Code.

        10.    DIP Liens. As security for the DIP Obligations, the DIP Agent, for the

benefit of the DIP Lenders, is hereby granted, on a final basis (effective upon the date of this

Final Order, without the necessity of the execution by the Debtors or the filing or recordation of

mortgages, security agreements, lockbox or control agreements, financing statements, or any

other instrument or otherwise or the possession or control by the DIP Parties), as contemplated

under the DIP Documents, valid, perfected, and unavoidable security interests in and liens upon

(such security interests and liens, collectively, the "DIP Liens") any and all present and after-

acquired tangible and intangible property and assets of the Debtors and their estates, whether real

or personal, of any nature whatsoever and wherever located, including, without limitation: (a) all

Prepetition Collateral; (b) all accounts, chattel paper, deposit accounts, documents (as defined in

the UCC), equipment, general intangibles, instruments, inventory, and investment property and

support obligations; (c) Commercial Tort Claims; (d) all books and records pertaining to the

22

other property described in this Paragraph 10; (e) without duplication, each Operating Mine and all patented and unpatented mining claims, license and permits required for the extraction of minerals or metals from any such Operating Mine; (f) all other goods (including but not limited to fixtures) and personal property of such Debtor, whether tangible or intangible and wherever located; and (g) to the extent not covered by the foregoing, all other assets or property of the Debtors, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing, and in each case to the extent of any Debtor's respective interest therein; (all of which being hereinafter collectively referred to as the "DIP Collateral"; provided, however, that (i) the DIP Collateral shall not include either (a) Excluded Property or (b) any avoidance action under chapter 5 of the Bankruptcy Code (including the proceeds thereof), and (ii) the DIP Liens shall be subject to the payment in full in cash of the amounts due under the Carve-Out and otherwise have the priority as follows:

(a) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected liens upon and security interests in all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected unavoidable security interest or lien on the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), subject to the Prepetition Lender Replacement Liens;

(b) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, junior, fully perfected lien upon and security interest in (other

23

than as set forth in clause (c) below) all of the Debtors' right, title and interest in, to and under all DIP Collateral which is subject to any validly perfected unavoidable security interest or lien in existence as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (including, without limitation, the Prepetition Liens and Permitted Liens);

(c)    pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, senior, priming, fully perfected lien upon and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral, junior only to (i) the Carve-Out, (ii) the Prepetition Liens, (iii) a valid perfected unavoidable security interest or lien in existence as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code and that is a Permitted Lien and expressly permitted in the DIP Credit Agreement to be senior to the DIP Liens granted to the DIP Agent and the DIP Lenders in this Final Order to secure the DIP Obligations and (iv) the Prepetition Lender Replacement Liens; and

(d)    the DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) except as expressly set forth herein or in the DIP Documents, any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors to the extent permitted by applicable non-bankruptcy law or (iii) any intercompany or affiliate liens of the Debtor. The DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

24

11.     Prepetition Secured Credit Facility Adequate Protection. As adequate

protection of the Prepetition Liens of the Prepetition Secured Parties in the Prepetition Collateral

against any Diminution in Value of such Prepetition Liens in the Prepetition Collateral, the

Prepetition Secured Parties are hereby granted, subject to the payment in full in cash of the

amounts due under the Carve-Out, solely to the extent of such Diminution in Value of the

Prepetition Liens in the Prepetition Collateral from and after the Petition Date and until the date

upon which the Prepetition Secured Obligations are paid in full in cash:

(a)     payment of regularly scheduled cash interest, calculated (i) in the

case of the Prepetition Revolving Credit Facility, at the non-default rate under the

Prepetition Credit Agreement and (ii) in the case of the Prepetition Secured Swaps, at the

rate of 2% per annum, in each case during the pendency of the chapter 11 cases;

(b)     payments in cash, promptly, but in no event later than fifteen (15)

days following receipt by the Debtors of any invoice therefor, of reasonable and

documented out-of-pocket fees, costs and expenses whether due on or prior to, or from

and after, the Petition Date to the Prepetition Secured Parties, as applicable, as they

become due and owing (without regard to the commencement of the Chapter 11 Cases) as

set forth in the Prepetition Credit Documents of the Prepetition Secured Parties (including

all reasonable prepetition and postpetition fees, costs, disbursements and expenses of

solely Wachtell, Lipton, Rosen & Katz, Paul Hastings LLP, Fennemore Craig, P.C.

(Nevada counsel), McMillan LLP (Canadian counsel), Morris, Nichols, Arsht & Tunnell

LLP (Delaware counsel) and RPA Advisors, and prepetition fees, costs, disbursement and

expenses of JDS Energy & Mining USA LLC and Fasken Martineau); provided,

however, none of such fees, costs, expenses or other amounts shall be subject to Court

25

approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided further, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee, counsel to the Committee and counsel to the Equity Committee and such parties shall have the ability to object to the reasonableness of the fees sought within ten (10) days of the receipt of such invoices solely for periods commencing on or after the Closing Date; provided further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine; provided, further, that unresolved disputes as to the reasonableness of any professional fees and expenses or the propriety of redactions will be determined by the Bankruptcy Court; provided, however, that the Debtors shall only be required to timely pay the undisputed amount of the disputed invoice pending such determination;

    (c)     intentionally omitted;

    (d)     continuing valid, binding, enforceable, unavoidable and fully perfected (as of the date of entry of the Interim Order) post-petition replacement liens on and security interests in the DIP Collateral, which Liens shall be (i) senior to the liens in favor of the DIP Parties securing the DIP Obligations and (ii) junior and subject to the Carve-Out (collectively, the "Prepetition Lender Replacement Liens");

    (e)     superpriority administrative expense claims (the "Prepetition Lender Superpriority Claims") under and to the extent set forth in sections 503 and

26

507(b) of the Bankruptcy Code against the Debtors' estates, which Prepetition Lender Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors (excluding avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof) with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the Prepetition Lender Superpriority Claims shall be subject to the payment in full in cash of the amounts due under the Carve-Out; provided that, for the avoidance of doubt, the Prepetition Lender Superpriority Claims shall be paid in cash in full prior to any payment of the DIP Superpriority Claims;

(f) the Prepetition Lenders under the Prepetition Revolving Credit Facility shall receive a repayment of $10,000,000 in respect of such Prepetition Secured Obligations owed to them from the cash and cash equivalents currently held by the Debtors pursuant to Section 11.1(q) of the Prepetition Credit Agreement; and

(g) access to the Debtors' books and records and such financial reports as are provided to the DIP Agent, in each case to the extent set forth in the DIP Credit Agreement.

In the event the Prepetition Secured Obligations are paid in full in cash, the Debtors' obligation to provide the Prepetition Secured Parties the adequate protection pursuant to

27

this Paragraph shall terminate on and as of the date of such payment, without further notice or action of any person. In the event that any portion of the Prepetition Secured Obligations is ordered by the Bankruptcy Court to be reinstated or the proceeds of the repayment thereof are disgorged, for so long as such portion of the Prepetition Secured Obligations remains outstanding, the adequate protection provided for in this Paragraph shall be reinstated with respect to such outstanding Prepetition Secured Obligations until the Prepetition Secured Obligations are paid in full in cash as if such previous payment or repayment thereof had never occurred.

12.     Release of Restricted Cash. As of the date of entry of the Interim Order and subject to the payments contemplated in Paragraph 11(f) of this Final Order, the Debtors are no longer required to comply with Section 11.1(q) of the Prepetition Credit Agreement.

13.     Carve-Out.

(a) As used in this Final Order, the term "Carve-Out" shall mean, to the extent unencumbered funds are not immediately available on the date of delivery of a Carve-Out Trigger Notice (as defined below) to pay administrative expenses in full, proceeds of DIP Collateral to pay the following expenses:

(i)     all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717;

(ii)    to the extent allowed by the Bankruptcy Court at any time, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors, the Committee or the Equity Committee pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "Professionals") at any time before or on the date of the delivery by the DIP Agent at the direction of the Majority Lenders (as defined in the DIP Credit Agreement) of a Carve-Out Trigger Notice (as defined below), whether such amounts are allowed by the Bankruptcy Court prior to or after delivery of such Carve-Out Trigger Notice (and including amounts

28

incurred but not invoiced prior to the delivery of the Carve-Out Trigger Notice); and

(iii)     all unpaid fees, disbursements, costs and expenses incurred by the Professionals on or after the day following the delivery by the DIP Agent at the direction of the Majority Lenders of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, in an aggregate amount not to exceed $2,000,000 (such amount set forth in clause (iii), the "Post-Carve-Out Trigger Notice Cap", and, together with such amounts set forth in clauses (i) and (ii) above, the "Carve-Out").

(b) As used herein, the term "Carve-Out Trigger Notice" means a written notice provided by the DIP Agent (at the direction of the Majority Lenders) to the Debtors, the U.S. Trustee, the Committee, and the Equity Committee that the Carve-Out is invoked, which notice can be delivered only when the DIP Agent is entitled to exercise remedies under the DIP Facility due to the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and the Termination Date has occurred. Notwithstanding anything to the contrary contained in this Final Order or in any DIP Documents, the liens and claims granted to any of the DIP Parties or Prepetition Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Prepetition Lender Superpriority Claims, Prepetition Lender Replacement Liens, Prepetition Secured Obligations, and Prepetition Liens) under, pursuant to or in connection with the DIP Facility, any DIP Document, this Final Order, or any Prepetition Credit Document shall be subject to the payment in full in cash of the amounts due under the Carve-Out.

(c) After receipt of the Carve-Out Trigger Notice, the Debtors shall provide notice by email and facsimile to all Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) and by filing a notice thereof on the docket of the Bankruptcy Court within

29

two (2) Business Days after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Professionals is subject to and limited by the Carve-Out.

(d) Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Final Order: (i) the Debtors shall be permitted to pay administrative expenses of Professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable, including on an interim basis; and (ii) such payments shall not reduce, or be deemed to reduce, the Carve-Out.

(e) Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, DIP Parties, Committee, Equity Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

14.    Limitation on Use of Cash Collateral and DIP Facility Proceeds. Notwithstanding anything herein to the contrary, no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors, the Committee, and the Equity Committee in connection with any of the following: (i) the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties, Prepetition Notes Parties or Prepetition Secured Parties, and each of their respective officers, directors, employees, agents, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission,

30

action or other matter (including formal discovery proceedings in anticipation thereof) (each, a "Loan Party Claim"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof; (b) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations, or Prepetition Liens; (c) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Notes Obligations; (d) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties or the Prepetition Notes Parties; (e) investigating or asserting any so-called "lender liability" claims and causes of action against the Prepetition Secured Parties, the DIP Parties or the Prepetition Notes Parties; and (f) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Credit Agreement, the Prepetition Notes or the DIP Loans; (ii) asserting any claims or causes of action against the DIP Parties or the Prepetition Secured Parties, including, without limitation, claims or actions to hinder or delay the assertions, enforcement or realization on the DIP Collateral or the liens securing the Prepetition Secured Obligations in accordance with this Final Order (including attempting to stay the exercise of any right or remedy described in clause (e), clause (f) or clause (g) of Paragraph 26 of this Final Order); (iii) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Agent or the DIP Lenders or the Prepetition Agents or the Prepetition Secured Parties hereunder or under the DIP Documents, in each of the foregoing cases without such applicable parties' prior written consent; (iv) to pay any amount on account of any claims

31

arising prior to the Petition Date unless such payments are (x) approved by an order of the Bankruptcy Court and (y) in accordance with the DIP Credit Agreement (or unless expressly permitted by paragraph 11 above); or (v) any purpose that is prohibited under the Bankruptcy Code; provided, however, that up to $50,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral or the Cash Collateral (collectively, the "Investigation Funds") may be used by the Committee to investigate any Loan Party Claim, the results of which investigation the Committee will share with the Equity Committee, and, provided, however, that to the extent any Investigation Funds remain unused by the Committee at the conclusion of the Committee's investigation of any Loan Party Claim, the Equity Committee may use such remaining Investigation Funds to further investigate any Loan Party Claim in accordance with the terms of this Final Order.

15.     Reservation of Certain Third Party Rights.  The Committee and Equity Committee shall have a maximum of seventy-five (75) calendar days from the date of the appointment of the Committee, and any other party in interest with standing (other than the Debtors) shall have 75 days from the Petition Date (in each case, the "Investigation Termination Date"), to commence an appropriate contested matter or adversary proceeding (a "Challenge") asserting any Loan Party Claim. If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the Prepetition Senior Agent, at the direction of the Prepetition Lenders, the Prepetition Indenture Trustee at the direction of the Prepetition Noteholders or the DIP Agent at the direction of the Majority Lenders), then: (a) the agreements, acknowledgements and stipulations contained in Paragraph D of this Final Order shall be irrevocably binding on the Debtors, the Committee, the Equity Committee, and all parties-in-interest and any and all successors-in-interest as to any of the

foregoing, without further action by any party or further order of this Court, and the Committee, Equity Committee, and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition Liens of the Prepetition Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Secured Obligations and the Prepetition Notes Obligations shall be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any subsequent chapter 7 cases, in the amounts set forth in Paragraph D, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Parties and the Prepetition Notes Parties (in each case, whether in their prepetition or postpetition capacity), together with each of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Secured Obligations or the Prepetition Notes Obligations. Notwithstanding anything to the contrary herein: (x) if any such Challenge is timely commenced, the stipulations contained in Paragraph D of this Final Order shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith) except to the extent that such stipulations are successfully challenged in such Challenge; (y) the Prepetition Secured Parties, the DIP Parties and the Prepetition Notes Parties reserve all of their rights to contest on any grounds any Challenge; and (z) the Prepetition Secured Parties, the DIP Parties and the Prepetition Notes Parties shall comply with any and all orders of the Bankruptcy Court in

33

connection with a successful Challenge; provided, however, that the Prepetition Secured Parties, the DIP Parties and the Prepetition Notes Parties preserve any and all of their rights to appeal and stay any orders of the Bankruptcy Court issued in connection with such successful Challenge. For the avoidance of doubt, nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates. If, prior to expiration of the Investigation Termination Date established above, the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed in the Chapter 11 Cases, the applicable Investigation Termination Date shall be extended for a period of 60 days for the chapter 7 trustee after the entry of a conversion order or chapter 11 trustee after the date of its appointment.

16.     Landlord Agreements.   Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any entity, in order for any Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed unenforceable and shall have no force and effect with respect to the transactions granting post-petition liens in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders or Prepetition Lenders in accordance with the terms of the DIP Documents, the Interim Order or this Final Order. Copies of this Final Order shall be provided to any contract counterparty affected by this provision.

17.     Bankruptcy Code Section 506(c) Waiver. Without limiting the Carve-Out, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred

34

in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral (as applicable) and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP Agent, any of the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to this Final Order).

18.    No Marshaling/Application of Proceeds.    The DIP Parties or the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable), and all proceeds thereof shall be received and used in accordance with this Final Order.

19.    Section 552(b).    The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral.

20.    Right to Credit Bid.    Subject to section 363(k) of the Bankruptcy Code, each of the DIP Agent (at the direction of the Majority Lenders) and Scotiabank (subject to obtaining any required consents of the Prepetition Lenders or the Prepetition Agents under the Prepetition Credit Documents and subject to any other terms and conditions in the Prepetition Credit Documents) shall have the right to "credit bid" the full allowed amount of their respective secured claims in connection with any sale of all or any portion of the DIP Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii) of the

35

Bankruptcy Code or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

21.     Disposition of Collateral; Application of Proceeds.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or the Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (subject to the consent of the Majority Lenders) and Scotiabank (subject to obtaining any required consents of the Prepetition Lenders or the Prepetition Agents under the Prepetition Credit Documents and subject to any other terms and conditions in the Prepetition Credit Documents) (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent or the Prepetition Agents, as applicable, or from any order of this Court); provided, however, that such consent shall be deemed to have been given with respect to the Debtors' sale, transfer or other dispositions of assets identified as "Held for Sale" in the Debtors' financial statements for the year ending December 31, 2014 and certain mining exploration properties set forth on Schedule 11.2(p) to the DIP Credit Agreement. Notwithstanding anything otherwise provided herein, upon the sale of any, all or substantially all of the Prepetition Collateral or any other assets of the Debtors (other than sales of gold and silver inventory in the ordinary course of business), the Debtors shall use cash in an amount equal to 100% of any net cash proceeds of such sale to (x) immediately satisfy any outstanding Prepetition Secured Obligations and (y) following the payment in full of the Prepetition Secured Obligations, to immediately satisfy any outstanding DIP Obligations to the extent required by the DIP Documents.

Notwithstanding the foregoing or anything to the contrary herein or in the DIP Credit Agreement, if all Prepetition Secured Obligations have not been paid in full in cash

prior to such payment in full in cash of the DIP Obligations, such payment in full in cash of the DIP Obligations shall only be permitted from proceeds of a financing transaction paid no earlier than the closing of such financing transaction (and a "financing transaction", for the avoidance of doubt, shall not include any sale of ANV, its subsidiaries or any assets of the foregoing) (provided that, for the avoidance of doubt, no Creditor Party (as defined in the RSA) waives any termination right under the RSA as a result of such financing transaction). For the avoidance of doubt, if the RSA is terminated by the Secured Lenders (as defined in the RSA) or otherwise terminated by the Requisite Consenting Noteholders (as defined in the RSA) or the Debtors in accordance with Section 5 of the RSA, the Secured Lenders may seek adequate protection (or exercise other rights and remedies) and oppose any refinancing of the DIP Facility (as defined in the RSA) (but may not oppose the proceeds from such a refinancing being used for the payment of the DIP Obligations as set forth herein) or consummation of another Alternative Transaction (as defined in the RSA).

      22.    Discharge Waiver. The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization or, so long as the RSA has not been terminated, the Plan (as defined in the RSA) has been confirmed. Other than as contemplated by the RSA, the Debtors shall not propose or support any plan of reorganization, sale of all or substantially all of the Debtors' assets, or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, on or prior to the earlier of the effective date of such plan of reorganization or sale or the Termination Date, of all

37

DIP Obligations unless the DIP Agent, with consent of the Majority Lenders (as contemplated under the DIP Credit Agreement), shall have otherwise consented in writing to such plan or sale.

23.    Restrictions on Granting Postpetition Liens.    Other than the Carve-Out or as otherwise provided in this Final Order or the DIP Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Final Order or the DIP Documents to the DIP Parties and Prepetition Secured Parties shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, and the Debtors will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Loans or any other DIP Obligations are outstanding or (ii) the DIP Lenders have any Commitment under the DIP Credit Agreement.

24.    Automatic Effectiveness of Liens.    The DIP Liens and Prepetition Lender Replacement Liens shall not be subject to a Challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Parties or the Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions. All DIP Collateral and Prepetition Lender Replacement Liens shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Documents and this Final Order. If the DIP Agent or Scotiabank hereafter requests that the Debtors execute and deliver to the DIP Agent or Scotiabank, as applicable, financing statements, security agreements, pledge

agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent or Scotiabank, as applicable, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or Prepetition Lender Replacement Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent or Scotiabank, as applicable, is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and the Prepetition Lender Replacement Liens. The DIP Agent or Scotiabank, as applicable, each in its sole discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

25.     Intercreditor Provisions:

(i)     Until payment in U.S. Dollars in full in cash or immediately available funds of all of the Prepetition Secured Obligations has occurred (the "Discharge of Prepetition Secured Obligations"), the DIP Agent and the DIP Lenders will not: (a) exercise or seek to exercise any rights or remedies with respect to any DIP Collateral (including taking any Enforcement Action (as defined below) with respect to DIP Collateral); provided that (i) the DIP Agent may take Enforcement Actions with respect to the DIP Collateral after the passage of a period of 30 days (the "Standstill Period") after the earlier of the Maturity Date (as defined in the

DIP Credit Agreement) and the date on which the DIP Agent provides written notice to the Prepetition Agents stating that the DIP Agent has declared all of the DIP Obligations to be immediately due and payable (such earlier date, the "Standstill Commencement Date") and (ii) in no event shall the DIP Agent or any DIP Lender exercise any rights or remedies with respect to the DIP Collateral if, notwithstanding the expiration of the Standstill Period, any Prepetition Agent or any other Prepetition Secured Party shall have commenced prior to the expiration of the Standstill Period and be diligently pursuing in good faith an Enforcement Action with respect to all or any material portion of the DIP Collateral; (b) on and after the Standstill Commencement Date, contest, protest, or object to any Enforcement Action by any Prepetition Agent or any other Prepetition Secured Party and has no right to direct any Prepetition Agent or any other Prepetition Secured Party to take any Enforcement Actions or take any other action under the Prepetition Credit Documents, in each case, with respect to the DIP Collateral or Prepetition Collateral; and (c) on and after the Standstill Commencement Date, but subject to the rights of the DIP Agent and DIP Lenders under the first proviso to clause (i)(a) above, object to the forbearance by any Prepetition Agent or any other Prepetition Secured Party from taking any Enforcement Action with respect to the DIP Collateral or the Prepetition Collateral. Notwithstanding the foregoing, the DIP Agent and the DIP Lenders may (x) take Enforcement Actions with respect to the DIP Collateral after the termination of the Standstill Period to the extent permitted by clause (i)(a) above, (y) take any action not adverse to the Prepetition Secured Parties in order to preserve or protect their rights in the DIP Collateral, and (z) bid for or purchase DIP Collateral in cash or by credit bid at any public foreclosure or sale upon such DIP Collateral in accordance with the terms of the DIP Documents and Paragraph 20 of this Final

40

Order, so long as, upon the closing of any such bid or credit bid, a Discharge of Prepetition Secured Obligations occurs.

      (ii)    On and after the Standstill Commencement Date, then, until the Discharge of Prepetition Secured Obligations has occurred, but subject to the rights of the DIP Agent and DIP Lenders under the first proviso to clause (i)(a) above, the Prepetition Agents and the Prepetition Lenders shall have the exclusive right to take Enforcement Actions with respect to the DIP Collateral and the Prepetition Collateral without any consultation with or the consent of the Debtors, the DIP Agent or any DIP Lender. In connection with any such Enforcement Action, the Prepetition Agents or any other Prepetition Secured Party may enforce the provisions of the Prepetition Credit Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.

      (iii)    For purposes of this Paragraph 25, "Enforcement Action" means, with respect to the DIP Obligations or the Prepetition Secured Obligations, the exercise of any rights and remedies with respect to any DIP Collateral or Prepetition Collateral, as applicable, securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies under, as applicable, the DIP Documents or the Prepetition Credit Documents, or applicable law, including without limitation the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the UCC of any applicable jurisdiction or under this Final Order.

      (iv)    So long as the Discharge of Prepetition Secured Obligations has not occurred, all DIP Collateral and the Prepetition Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection or realization on, such DIP Collateral and the Prepetition Collateral upon the exercise of remedies by Prepetition Agents or

the Prepetition Lenders shall be applied by the Prepetition Agents to the Prepetition Secured Obligations in such order as specified in the relevant Prepetition Credit Documents. Upon the Discharge of Prepetition Secured Obligations, the Prepetition Agents shall deliver to the DIP Agent any remaining DIP Collateral and remaining proceeds of DIP Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the DIP Agent to the DIP Obligations in such order as specified in the DIP Documents.

26. <u>Automatic Stay: Rights and Remedies Upon Event of Default</u>. Subject to the second sentence of this Paragraph, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefit, privileges, remedies and provisions of this Final Order and the DIP Documents in each case without further notice, motion, application to, order of, or hearing before, this Court. Subject to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit, subject to the provisions set forth in Paragraph 25, the Prepetition Agents and the DIP Parties (or any of their respective agents) to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Credit Agreement, all rights and remedies provided for in the DIP Documents and Prepetition Credit Documents, as applicable, and to take (including, without limitation, during any Standstill Period (as defined below)) any or all of the following actions without further notice, motion or application to, order of or hearing before, this Court: (a) immediately terminate the Debtors' rights, if any, under this Final Order or the DIP Credit Agreement to use Cash Collateral, except to the extent such cash may be used for the Carve-Out; (b) cease making any DIP Loans to the Debtors; (c) declare the

Individual Commitments of each DIP Lender to make DIP Loans to be terminated, whereupon such Individual Commitments and obligation shall be terminated; (d) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; (e) freeze monies or balances in the Debtors' accounts; (f) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders (or any of their respective agents) against the DIP Obligations, or with the Prepetition Agents against the Prepetition Secured Obligations, enforce all rights and remedies against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations, or the Prepetition Collateral in the possession of the Prepetition Agents for application towards the Prepetition Obligations, and otherwise proceed to protect, or enforce all rights and remedies of the DIP Parties under the DIP Credit Agreement, any of the other DIP Documents, or the Prepetition Secured Parties under the Prepetition Credit Documents or Secured Swaps, or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in the DIP Credit Agreement and the other DIP Documents or any instrument pursuant to which the DIP Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the DIP Parties or Prepetition Secured Parties, as applicable; and (g) take any other actions or exercise any other rights or remedies permitted under the Interim Order or this Final Order, as applicable, the DIP Documents (including under Section 13.2(b) thereof) or the Prepetition Credit Documents, as applicable, or applicable law to effectuate the repayment of the DIP Obligations

43

or the Prepetition Secured Obligations, as applicable; provided, however, that the Prepetition Agents shall not take any actions in clauses (e), (f) or (g) of this Paragraph unless and until the occurrence of the Standstill Commencement Date; provided further that prior to the exercise of any right or remedy described in clauses (e), (f) or (g) of this Paragraph, the DIP Agent and the Prepetition Agents shall be required to provide five (5) Business Days written notice to the Debtors (with a copy to their bankruptcy counsel), counsel to the Committee, counsel to the Equity Committee, the DIP Parties, the Prepetition Secured Parties and the U.S. Trustee. Other than the U.S. Trustee, no party in interest shall have the right to contest the enforcement of the rights and remedies set forth in this Final Order or the DIP Documents on any basis other than an assertion that no Event of Default has occurred and is continuing, and, except with respect to such an assertion, no party in interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or seek any injunctive relief inconsistent with the provisions of this Final Order or the DIP Documents. Unless the Court determines during such five (5) Business Day notice period that such Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Lenders and as to Prepetition Agents, shall automatically be terminated at the end of such notice period, without further notice or order, and, upon expiration of such notice period, each of the DIP Agent and the Prepetition Agents, shall be permitted to exercise all rights and remedies set forth in this Final Order, the DIP Credit Agreement, the other DIP Documents or the Prepetition Credit Documents, and as otherwise available at law without further notice, motion or application to, order of or hearing before, this Court; provided, however, that notwithstanding anything in this Final Order to the contrary, following the exercise by the DIP Agent or the DIP Lenders of any of their respective rights or remedies as set forth in this Paragraph 26 or under the DIP Documents or applicable law in

44

respect of the DIP Collateral, no proceeds of the Prepetition Collateral, including, without limitation, any such collateral, or proceeds thereof, that is subject to the Prepetition Liens or Prepetition Lender Replacement Liens, shall be used to pay any DIP Obligations until after the Prepetition Secured Obligations have been paid in full. The rights and remedies of the DIP Parties and Prepetition Secured Parties, as applicable, specified herein are cumulative and not exclusive of any rights or remedies that the DIP Parties may have under the DIP Documents or otherwise. The Debtors shall use their commercially reasonable efforts to cooperate with the DIP Parties or the Prepetition Secured Parties in their exercise of their rights and remedies, whether against the DIP Collateral, the Prepetition Collateral, the Prepetition Lender Replacement Liens or otherwise. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Paragraph 26 of this Final Order and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder. The delay or failure to exercise rights and remedies under the applicable DIP Documents or the Prepetition Credit Documents or this Final Order by the DIP Agent or the DIP Lenders or Prepetition Secured Parties shall not constitute a waiver of the DIP Agent's or such DIP Lenders' or Prepetition Secured Parties' rights hereunder, thereunder or otherwise, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents or Prepetition Credit Documents, as the case may be.

27.   Binding Effect.   The provisions of this Final Order shall be binding upon and inure to the benefit of the Debtors, the DIP Parties, the Prepetition Secured Parties and their respective successors and assigns. To the extent permitted by applicable law, this Final Order shall bind any successor to the Debtors, including, without limitation, any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event

45

of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Final Order.

28.     Survival.     The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Final Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Final Order and the DIP Documents (and with respect to the entry of any order as set forth in clause (ii) or (iii) of this Paragraph, the Prepetition Lender Replacement Liens and Prepetition Lender Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Final Order and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged or otherwise treated under a plan of reorganization in accordance with the terms of the RSA. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Documents unless agreed to by and among the Debtors and the DIP Parties.

29.     Modifications of DIP Documents.     Notwithstanding anything to the contrary contained in the RSA, the Debtors and the DIP Parties are hereby authorized, on a final basis, to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the DIP Documents (other than the Interim Order and this Final Order) without further notice, motion or application to, order of or hearing before, this Court,

46

and without the consent of the Prepetition Secured Parties. Any material modification or amendment to the DIP Documents shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon notice to counsel for the Committee, the Equity Committee, the U.S. Trustee, the Prepetition Agents and the Prepetition Indenture Trustee; provided, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Documents shall not require an order of this Court.

30.     Insurance Policies.  As of the date of entry of the Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral or Prepetition Lender Replacement Liens: (i) Scotiabank shall be, and shall be deemed to be, without any further action or notice, named as additional insured for the benefit of the Prepetition Secured Parties on a first priority basis, and the DIP Agent shall be deemed to be, without any further action or notice, named as additional insured for the benefit of the DIP Parties on a second priority basis; and (ii) Scotiabank shall be, and shall be deemed to be, without any further action or notice, named as a loss payee, for the benefit of the Prepetition Secured Parties on a first priority basis, and the DIP Agent shall be deemed to be, without any further action or notice, named as additional insured for the benefit of the DIP Parties on a second priority basis. The Debtors are authorized, on a final basis, and, upon the written request of Scotiabank or the DIP Agent shall take all actions necessary to have each of them, as applicable, be added as an additional insured or loss payee, as applicable, on each such insurance policy maintained by the Debtors which in any way relates to the DIP Collateral or Prepetition Lender Replacement Liens. The provisions of this paragraph are subject to provisions of paragraph 25 in all respects.

47

31.     Protection Under Section 364(e) of the Bankruptcy Code.  The DIP Parties
and the Prepetition Secured Parties have acted in good faith in connection with this Final Order
and their reliance on this Final Order is in good faith.  Based on the record of these Chapter 11
Cases, and in accordance with section 364(e) of the Bankruptcy Code, if any or all of the
provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal,
modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the
DIP Parties, or adequate protection obligations owing to the Prepetition Secured Parties incurred
prior to the actual receipt by the DIP Agent or Prepetition Agents, as applicable, of written notice
of the effective date of such reversal, modification, vacation or stay, or (ii) validity or
enforceability of any DIP Loans or other advances previously made or any claim, lien, security
interest or priority authorized or created hereby or pursuant to the DIP Documents with respect
to any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured
Parties.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash
Collateral or the incurrence of DIP Obligations, or adequate protection obligations owing to the
Prepetition Secured Parties by the Debtors prior to the actual receipt by the DIP Agent or
Prepetition Agents, as applicable, of written notice of the effective date of such reversal,
modification, vacation or stay, shall be governed in all respects by the provisions of this Final
Order, and the DIP Parties and the Prepetition Secured Parties shall be entitled to all of the
rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code,
this Final Order, and the DIP Documents with respect to all uses of Cash Collateral and the
incurrence of DIP Obligations, and adequate protection obligations owing to the Prepetition
Secured Parties.

48

32.     Effect of Dismissal or Conversion of Chapter 11 Cases. If the Chapter 11

Cases are dismissed or converted, then such dismissal or conversion of the Chapter 11 Cases

shall not affect the rights of the DIP Parties and the Prepetition Secured Parties under their

respective DIP Documents, Prepetition Credit Documents, or this Final Order, and all of the

respective rights and remedies thereunder of the DIP Parties and the Prepetition Secured Parties

shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed or

converted. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order

shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP

Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the

protections afforded to the DIP Parties pursuant to this Final Order and the DIP Documents shall

continue in full force and effect and shall maintain their priorities as provided in this Final Order

until all DIP Obligations shall have been paid and satisfied in full in cash (and that such DIP

Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal,

remain binding on all interested parties), in each case on a junior basis to those Prepetition Liens,

Prepetition Lender Replacement Liens and Prepetition Lender Superpriority Claims granted to

and conferred upon the Prepetition Secured Parties; (ii) those Prepetition Liens, Prepetition

Lender Replacement Liens and Prepetition Lender Superpriority Claims granted to and conferred

upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain

their priorities as provided in this Final Order until all Prepetition Secured Obligations shall have

been paid and satisfied in full in cash (and that such Prepetition Lender Superpriority Claims and

Prepetition Secured Noteholder Superpriority Claims shall, notwithstanding such dismissal,

remain binding on all interested parties); and (iii) to the greatest extent permitted by applicable

law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of

49

enforcing the DIP Liens, Prepetition Lender Replacement Liens, DIP Superpriority Claims, and Prepetition Lender Superpriority Claims referred to herein.

33.    Proofs of Claim.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, (i) the DIP Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein; and (ii) the Prepetition Indenture Trustee shall be authorized (but not required) to file a master proof of claim against the Debtors (the "Prepetition Indenture Trustee Master Proof of Claim") on behalf of itself and the Prepetition Noteholders on account of their prepetition claims arising under the Prepetition Notes Indenture.  If the Prepetition Indenture Trustee so files a Prepetition Indenture Trustee Master Proof of Claim in the Chapter 11 Case of Allied Nevada Gold Corp. (Case No. 15-10503), the Prepetition Indenture Trustee and each Prepetition Noteholder, and each of their respective successors and assigns, shall be deemed to have filed proofs of claim in respect of their claims against every Debtor that is liable for such liability (regardless of whether such liability is fixed, contingent, matured, unmatured, full or partial) arising under the Prepetition Notes Indenture as primary obligor, guarantor or otherwise, and the claims of the Prepetition Indenture Trustee and each Prepetition Noteholder (and their respective successors and assigns) shall be allowed or disallowed as if such entities had filed separate proofs of claim in each of the respective Chapter 11 Cases or any successor cases.  The Prepetition Indenture Trustee shall further be authorized to amend, supplement or otherwise modify such Prepetition Indenture Trustee Master Proof of Claim from time to time, to the extent permitted by applicable law.  The Prepetition Indenture Trustee shall not be required to file with the Prepetition Indenture Trustee Master Proof of Claim any agreements, instruments, or other documents evidencing the obligations referenced in such

50

proof of claim. The provisions set forth in this Paragraph and any Prepetition Indenture Trustee Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the rights of the Prepetition Indenture Trustee and each Prepetition Noteholder as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

34.     Rights of Access and Information. The representatives, advisors, consultants, agents and/or employees of the DIP Agent and the Prepetition Secured Parties shall be afforded reasonable access to the Debtors' premises, during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses, and their books and records in accordance with this Final Order or the DIP Documents or the Prepetition Credit Documents and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of any of the Debtors. For the avoidance of doubt, any financial reports, budgets, forecasts or other deliveries provided by the Debtors to the DIP Lenders will also be provided to the Requisite Secured Lenders (as defined in the RSA), the Committee, and the Equity Committee.

35.     No Impact on Certain Contracts or Transactions. No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Final Order.

51

36. No Impact on Compliance with Laws. Nothing in the Budget, the DIP Facility, or this Final Order is intended to limit or restrict in any fashion the Debtors' ability to use Cash Collateral to perform those activities required to remain in, or to return to, compliance with laws in accordance with 28 U.S.C. § 959 including, if necessary, obtaining additional surety or other financial assurance for such compliance.

37. No Third Party Rights. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary other than the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

38. Findings of Fact and Conclusions of Law. This Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

39. Choice of Law; Jurisdiction. The DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code. The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

40.    Controlling Effect of Final Order.    To the extent any provision of this

Final Order conflicts with any provision of the Motion, any DIP Document or the Interim Order,

the provisions of this Final Order shall control.

Wilmington, Delaware
Date: April _17_, 2015

for THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

53